1 | Kenneth G. Parker (SBN 182911)
   | kparker@tlpfirm.com
2 | Robert G. Loewy (SBN 179868)
   | rloewy@tlpfirm.com
3 | TEUTON, LOEWY & PARKER LLP
   | 3121 Michelson Drive, Suite 250
4 | Irvine, California 92612
   | Telephone:  (949) 442-7100
5 | Facsimile:   (949) 442-7105

6 | Attorneys for Plaintiffs

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | HARRY J. BINDER, *et al.*,                    ) **Case No.: CV 07-02760-GHK (SSx)**
                                                  )
12 |            Plaintiffs,                        ) **APPENDIX OF EVIDENCE, VOL. I,**
                                                  ) **FILED IN CONNECTION WITH**
13 |    vs.                                        ) **PLAINTIFFS' MOTION FOR**
                                                  ) **SUMMARY JUDGMENT**
14 | DISABILITY GROUP, INC., a corporation;        ) **[EXHIBITS A TO AA;**
    | RONALD MILLER, an individual; and           ) **DECLARATIONS; DEPOSITION**
15 | DOES 1 to 10, inclusive,                      ) **EXCERPTS]**
                                                  )
16 |            Defendant.                         ) [NOTICE AND MOTION; JOINT
                                                  ) MEMORANDUM; APPENDIX OF
17 |                          ♠                     ) EVIDENCE, VOL. II; COMPENDIUM
                                                  ) OF AUTHORITIES; JOINT
18 |                                               ) STATEMENT OF MATERIAL FACT;
                                                  ) AND (PROPOSED) ORDER FILED
19 |                                               ) CONCURRENTLY HEREWITH]
                                                  )
20 |                                               ) Date:     January 12, 2009
                                                  ) Place:    Courtroom 650
21 |                                               )           Roybal Federal Building
                                                  )           255 East Temple Street
22 |                                               )           Los Angeles, CA 90012
                                                  ) Time:     9:30 a.m.
23 |                                               )
                                                  ) Trial Date: None
24 |                                               )
                                                  )
25 |                                               )
                                                  )
26 |                                               )
                                                  )
27 |                                               )
                                                  )
28 |

---

APPENDIX OF EVIDENCE, VOLUME I

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A. | Declaration of Harry J. Binder | 2 |
| B. | Declaration of Ron Miller | 16 |
| C. | Declaration of Mario Davila | 33 |
| D. | Declaration of Jessica G. Bower | 39 |
| E. | Declaration of Kenneth G. Parker | 43 |
| F. | Declaration of Joyce Sneden | 49 |
| G. | Declaration of Michael Vincent dated July 19, 2007 | 53 |
| H. | Declaration of David Dimas dated January 8, 2008 | 58 |
| I. | Intentionally Omitted | |
| J. | Declaration of Jorge Rodriguez | 63 |
| K. | Intentionally Omitted | |
| L. | Intentionally Omitted | |
| M. | Deposition transcript of Ronald Miller | 76 |
| N. | Deposition transcript of David Dimas Vol. I. | 100 |
| O. | Deposition transcript of David Dimas Vol. II. | 125 |
| P. | Deposition transcript of Michael Vincent | 147 |
| Q. | Deposition transcript of Mary Ann Addington | 159 |
| R. | Deposition transcript of Karen Funk Sellars | 176 |
| S. | Deposition transcript of Herb Battel | 193 |
| T. | Deposition transcript of Barbra Williams | 211 |
| U. | Deposition transcript of Mamon Trotter, Jr. | 231 |
| V. | Deposition transcript of Iris Goldfaden | 248 |
| W. | Deposition transcript of Stacey Heinzman | 265 |
| X. | Deposition transcript of David G. Michael | 277 |

| | | |
|---|---|---|
| Y. | Deposition transcript of Lynda L. Boileau | 291 |
| Z. | Deposition transcript of Tiffany Gordo | 312 |
| AA. | Deposition transcript excerpts of Jorge Rodriguez | 333 |

# EXHIBIT A

1 |                   **DECLARATION OF HARRY J. BINDER**

2 |       I, Harry J. Binder, declare as follows:

3 |         1.     I have personal knowledge of the following facts, and if called as a

4 | witness, could and would completely testify to them.

5 |

6 |         2.     This Declaration is provided in Support of Plaintiffs' Motion for

7 | Summary Judgment or in the alternative partial summary judgment.

8 |

9 |         3.     I am a U.S. citizen having offices located at 300 Rabro Drive, Hauppauge,

10 | New York 11788.

11 |

12 |         4.     My first exposure to social security disability advocacy came when a

13 | disabled fire fighter arrived at my office and asked for my help. This fire fighter was a

14 | veteran of many years on the force, and after being seriously injured, had been unjustly

15 | denied social security disability benefits. I had not handled a social security disability

16 | case, but I promised the fire fighter I would get up to speed on the law, handle his case,

17 | and get his benefits. I did. After I took on that case, I expanded my practice to include

18 | social security disability cases.

19 |

20 |         5.     In 1979, my brother Charles E. Binder left his position as a legal aid

21 | defense attorney in New York and joined me. We founded Binder & Binder, a law

22 | firm focused primarily on assisting claimants in obtaining social security disability

23 | benefits from the U.S. Social Security Administration.

24 |

25 |         6.     Almost 30 years later, our two person firm has grown into a national

26 | organization with 21 offices in 7 states and with approximately 750 employees

27 | handling cases nationwide in all 50 states, Puerto Rico, the Virgin Islands, American

28 | Samoa and even handling inquiries from servicemen and families based around the

1 | world. This organization of related entities, collectively known as "Binder & Binder,"
2 | has been providing and continues to provide legal, paralegal and non-attorney
3 | advocacy services in the field of social security disability benefits in the United States.
4 | Despite its size, I still personally handle certain cases, particularly cases that reach the
5 | United States district courts, and have, in fact appeared in this district a few times in
6 | the past several years.

7

8 |     7.    Today, Binder and Binder is one of the largest and most well-known firms
9 | in the field of social security disability benefits.  Binder & Binder has provided its
10 | services under the marks "BINDER AND BINDER" since 1979 and under "BINDER
11 | & BINDER" and "BINDER & BINDER (and design)" since 1995.

12

13 |     8.    Binder & Binder's affiliated entities include Binder and Binder-The
14 | National Social Security Disability Advocates, LLC, ("Binder Parent LLC") which is a
15 | limited liability company organized under the laws of the state of Delaware with its
16 | principal place of business located at 300 Rabro Drive, Hauppauge, New York 11788.
17 | Charles and I each own 50% of Binder Parent LLC.  Binder Parent LLC provides non-
18 | attorney advocacy services in the field of social security disability benefits and is the
19 | parent of, and owns 100%, of the capital interest in the following regional entities:
20 | Binder and Binder-The National Social Security Disability Advocates (CA) LLC;
21 | Binder and Binder-The National Social Security Disability Advocates (NY) LLC;
22 | Binder and Binder- The National Social Security Disability Advocates (NJ) LLC;
23 | Binder and Binder-The National Social Security Disability Advocates (PA) LLC;
24 | Binder and Binder-The National Social Security Disability Advocates (NC) LLC;
25 | Binder and Binder- The National Social Security Disability Advocates (FL) LLC;
26 | Binder and Binder-The National Social Security Disability Advocates (TX) LLC; and
27 | Binder and Binder-The National Social Security Disability Advocates (IL) LLC.

28

1    9.    Binder and Binder-The National Social Security Disability Advocates

2  (CA) LLC is a limited liability company organized under the laws of the State of

3  California with a principal place of business located at 4000 West Metropolitan Drive,

4  Suite 350, Orange, CA 92868. Its capital interest is owned 100% by Binder Parent

5  LLC. It provides non-attorney advocacy services in the field of social security

6  disability benefits primarily to people in that particular region of the country.

7

8    10.    Binder and Binder- The National Social Security Disability Advocates

9  (NY) LLC is a limited liability company organized under the laws of the State of New

10  York with a principal place of business located at 300 Rabro Drive, Hauppauge, NY

11  11788. Its capital interest is owned 100% by Binder Parent LLC.  It provides non-

12  attorney advocacy services in the field of social security disability benefits primarily to

13  people in that particular region of the country.

14

15    11.    Binder and Binder- The National Social Security Disability Advocates

16  (NJ) LLC is a limited liability company organized under the laws of the State of New

17  Jersey with a principal place of business located at 11 Eves Drive, Suite 130, Marlton,

18  NJ 08053. Its capital interest is owned 100% by Binder Parent LLC. It provides non-

19  attorney advocacy services in the field of social security disability benefits primarily to

20  people in that particular region of the country.

21

22    12.    Binder and Binder- The National Social Security Disability Advocates

23  (PA) LLC is a limited liability company organized under the laws of the State of

24  Pennsylvania with a principal place of business located at 1800 John F. Kennedy

25  Blvd., Suite 604, Philadelphia, PA 19103.  Its capital interest is owned 100% by

26  Binder Parent LLC. It provides non-attorney advocacy services in the field of social

27  security disability benefits primarily to people in that particular region of the country.

28

1        13.    Binder and Binder- The National Social Security Disability Advocates

2    (NC) LLC is a limited liability company organized under the laws of the State of North

3    Carolina with a principal place of business located at 3200 Atlantic Avenue, Suite 112,

4    Raleigh, NC 27604. Its capital interest is owned 100% by Binder Parent LLC. It

5    provides non-attorney advocacy services in the field of social security disability

6    benefits primarily to people in that particular region of the country.

7

8        14.    Binder and Binder-The National Social Security Disability Advocates

9    (FL) LLC is a limited liability company organized under the laws of the State of

10   Florida with a principal place of business located at 4511 North Himes Avenue, Suite

11   160, Tampa, FL 33614. Its capital interest is owned 100% by Binder Parent LLC. It

12   provides non-attorney advocacy services in the field of social security disability

13   benefits primarily to people in that particular region of the country.

14

15       15.    Binder and Binder-The National Social Security Disability Advocates

16   (TX) LLC is a limited liability company organized under the laws of the State of Texas

17   with a principal place of business located at 8111 Lyndon B. Johnson Freeway, Suite

18   700, Dallas, TX 75251. Its capital interest is owned 100% by Binder Parent LLC. It

19   provides non-attorney advocacy services in the field of social security disability

20   benefits primarily to people in that particular region of the country.

21

22       16.    Binder and Binder- The National Social Security Disability Advocates

23   (IL) LLC is a limited liability company organized under the laws of the State of Illinois

24   with a principal place of business located at 33 North LaSalle, Suite 1910, Chicago, IL

25   60602. Its capital interest is owned 100% by Binder Parent LLC. It provides non-

26   attorney advocacy services in the field of social security disability benefits primarily to

27   people in that particular region of the country.

28

4

1      17.    Law Offices-Binder and Binder, P.C. is a professional corporation

2 organized under the laws of the State of New York with a principal place of business

3 located at 300 Rabro Drive, Hauppauge, New York 11788. It provides legal and

4 paralegal services in the field of social security disability benefits nationwide including

5 cases pending before the United States District Courts and appeals. Charles E. Binder

6 and I are sole co-shareholders of this professional corporation.

7

8      18.    Charles Binder and I are co-owners of the subsisting incontestable and

9 duly renewed U.S. Federal trademark and/or service mark Principal Register

10 registrations for "BINDER & BINDER" (Reg. No. 2,161,478) and "BINDER &

11 BINDER (and design)" (Reg. No. 2,109,191) both for "prints and publications,

12 namely, pamphlets, brochures, newsletters and bulletins concerning legal issues" in

13 Int. Class 16 and "legal and paralegal services, including providing aid in the

14 preparation and filing of government forms" in Int. Class 42; and "BINDER AND

15 BINDER" (Reg. No. 2,161,479) for "legal and paralegal services, including providing

16 aid in the preparation and filing of government forms" in Int. Class 42 ("Binder &

17 Binder Marks"). A Section 8 & 15 declaration has been filed and accepted in

18 connection with each of these registrations. Additionally each of the above

19 registrations has been duly renewed and attached to the Appendix of Evidence as

20 Exhibit 1 are true and correct copies of our three federal trademark and service mark

21 registrations, the Notices of Acceptance and Acknowledgement of §§8 and 15

22 Declarations and Notice of Acceptance of §8 Declaration and §9 Renewals for each of

23 the registrations.

24

25      19.    Each of the above registrations were assigned to Charles E. Binder and

26 me on March 10, 2006. Attached to the Appendix of Evidence as Exhibit 2 are true

27 and correct copies of the assignment of U.S. Trademark and Service Mark

28 Registration Nos. 2,161,479, 2,161,478, and 2,109,191 on March 22, 2006 to Charles

5

1  E. Binder and me and the United States Patent and Trademark Office Notice of

2  Recordation of Assignment Document confirming the official recordation of the

3  assignment at the United States Patent and Trademark Office recorded at Reel/Frame

4  003273/0220 on March 16, 2006.

5

6      20.    Charles and I, as co-owners and co-registrants of the Binder & Binder

7  Marks, licensed the right to use the Binder & Binder Marks to the Binder Parent LLC

8  and the entities listed in Paragraphs 8 through 17 above.  Since we control all of these

9  entities through our ownership, Charles and I have control over the quality of services

10  delivered in association with the Binder & Binder Marks, and receive compensation

11  for their use through our ownership interests in the various entities.  Charles and I have

12  never licensed the Binder & Binder Marks to any other advocacy group or firm for any

13  use of any kind, and are very protective of the Binder & Binder Marks, since they and

14  our companies are closely associated with our collective reputation and image.

15

16      21.    It is our policy, and that of our related Binder & Binder entities, to use the

17  federal trademark registration notice symbol "®" in connection with our registered

18  trademarks on all of our advertising and promotional material including our television

19  ads, website, prints and publications, pamphlets, brochures, newsletters, bulletins,

20  letterhead and other materials bearing the Binder & Binder Marks.  Attached to the

21  Appendix of Evidence as Exhibit 5 are true and correct representative samples of our

22  prints and publications and excerpts from our Internet website at

23  www.binderandbinder.com.

24

25      22.    The names BINDER AND BINDER and BINDER & BINDER comprise

26  a distinctive part of Binder & Binder's company trade name and have been

27  prominently displayed in connection with its goods and services. Binder & Binder

28  promotes its legal, paralegal and non-attorney advocacy services, including providing

1  aid in the preparation and filing of government forms via a website, toll-free number,
2  and regional offices located throughout the United States. In particular Binder &
3  Binder has offices located in the following locations: Manhattan, NY; Hauppauge, NY;
4  Bronx, NY; Brooklyn, NY; Forest Hills, NY; Jericho, NY; White Plains, NY;
5  Bloomfield, NJ; Philadelphia, PA; Fort Lauderdale, FL; Tampa, FL; Miami, FL;
6  Chicago, IL; Orange, CA; Hayward, CA; San Bernardino, CA; Los Angeles, CA; Long
7  Beach, CA; Raleigh, NC; Houston, TX; and Dallas, TX.

8

9      23.    Since adoption and first use of the Binder & Binder Marks in 1979,
10  Binder & Binder has extensively and consistently promoted the Binder & Binder
11  Marks by prominently displaying it on advertising for its  services which have been
12  advertised, promoted and offered for sale and sold in interstate commerce in the United
13  States, including the State of California.  In particular, the marks have been used on
14  nationwide television, radio, online and print ads and have expended a significant
15  amount of resources in promoting their Binder and Binder brand under the Binder &
16  Binder Marks.  Plaintiffs spend millions annually on television, radio, print, and
17  internet advertising.

18

19      24.    In addition, Plaintiffs have spent millions more in television advertising
20  prior to 2002 in promoting their brand.  About 75% of these television expenditures are
21  on National Network Cable television, including TNT, Discovery Channel, CNN,
22  CNN-Headline News, Fox, Fox News, Court TV, History Channel, Hallmark Channel,
23  Spike, Sci-Fi Channel, and USA. In addition, local TV spots are run in New York, Los
24  Angeles, Chicago, Philadelphia, and Dallas.  Local New York TV spots run on WLNY
25  and WNBC-TV, Long Island 12, New York Interconnect, and New York 1.  Local Los
26  Angeles TV spots run on KCAL-TV and the Los Angeles Interconnect.  Local Chicago
27  TV spots run on the Chicago Interconnect.  Local Philadelphia TV spots run on the
28  Philadelphia Interconnect.  Local Dallas TV spots run on the Dallas Interconnect.

7

1 Plaintiffs' commercials have run on WCBS-TV, WNYW-TV, WWOR-TV, WNEW-
2 TV, KNBC-TC, WABC, WNBC, KGO, KFI, KABC and a multitude of local stations.
3 In addition, Plaintiffs run a radio schedule on the Air America Radio Network. Thus,
4 in total, Plaintiffs have spent at least the following amounts on advertising within the
5 last ten years:

6          1997 - $2,195,273.35
7          1998 - $2,217,973.40
8          1999 - $2,267,173.00
9          2000 - $2,850,698.00
10         2001 - $2,631,184.00
11         2002 - $2,766,356.96
12         2003 - $3,996,828.52
13         2004 - $5,960,226.19
14         2005- $7,644,075.40
15         2006 - $8,392,031.21
16         2007 - $9,933,920.00

17 The amounts of advertising expenditures are obtained from Binder & Binder's
18 financial records. The financial records are kept in the ordinary course of business by
19 those on my staff whose duty it is to accurately record such information around the
20 time it becomes known or, in this case, expenses are incurred or paid.

21

22     25.    Additionally, Binder and Binder has devoted substantial resources each
23 year advertising the Binder & Binder Marks including advertising in the Yellow Pages,
24 on search engines such as Yahoo, Google, MSN, on national television and radio, and
25 through thousands of direct mailings distributed throughout the United States.

26

27     26.    I am familiar with the policies and procedures of Binder & Binder. As
28 part of their duties, the people on Binder & Binder's staff record the Internet

8

1  advertising expenditures.  These records are kept in the ordinary course of business by

2  those on my staff whose duty it is to accurately record such information around the

3  time it becomes known or at the time the expenses are incurred or paid.  Through

4  Internet advertising alone since 2005 Binder and Binder has spent at least $2.8 million

5  on search engine advertising such as Google, Overture, Verizon Superpages, MSN and

6  on the www.binderandbinder.com website.

7

8      27.   A significant portion of Binder & Binder's business is conducted through

9  its distinct internet website located at www.binderandbinder.com which has been

10  continuously operated since 1999 and serves as a substantial advertising tool.

11  Accordingly, if a potential client or consumer types in www.binderandbinder.com into

12  the web browser address bar, the consumer would be directed to Binder & Binder's

13  website, where he or she could view its offerings of services.

14

15      28.   I am familiar with the policies and procedures of Binder & Binder.  The

16  people on Binder & Binder's staff, as part of their duties, record solicitations that come

17  to us via the Internet as those solicitations come in.  This data regarding solicitation is

18  tracked in our business records at or around the time it occurs by people on my staff

19  whose duty it is to record it accurately and correctly.  In addition, we also track, in the

20  due course of our business, the number of clients who come to us via our website and

21  the Internet.  A significant and critical amount of Plaintiffs' solicitation is conducted

22  via the Internet.  Each day, it receives approximately 2,000 visits by potential

23  customers and their website currently generates about 4,000 confirmed new clients

24  annually.

25

26      29.   Additionally, Binder & Binder is well known among other legal

27  professionals who primarily handle social security disability claims.  Charles Binder

28  often addresses meetings of professional groups and is a frequent speaker at meetings

9

1  of the National Organization of Social Security Claimant Representatives (NOSSCR)
2  and advocacy groups for various disabilities. Charles E. Binder also hosts the firm's
3  weekly national network radio program, "The BINDER & BINDER® SOCIAL
4  SECURITY DISABILITY DIGEST." The program often features prominent guests
5  from government and chief executives from most of the major disability advocacy
6  organizations in the country.

7

8      30.    Binder & Binder's advertising has generated significant sales in the
9  United States of its legal, paralegal and non-attorney advocacy services, provided
10  under the Binder & Binder Marks since their original adoption and use. Binder &
11  Binder has been careful, skillful and meticulous in the conduct of its business offering
12  legal, paralegal, non-attorney advocacy and related services, including providing aid in
13  the preparation and filing of government forms under the Binder & Binder Marks.

14

15     31.    Binder & Binder's increasing caseload is a result of the recognition by
16  the public of the quality of its work. Due to its good reputation, Binder & Binder  also
17  receives referrals from attorneys, accountants, and insurance agents, and are also asked
18  by federal judges to represent claimants in difficult matters. Binder & Binder
19  constantly receives letters from clients thanking them for their excellent work and
20  commenting that they are referring their friends and associates to Binder & Binder,
21  because of their excellent reputation and work product. Charles Binder and I are often
22  recognized as a result of their advertising and website and stopped and thanked for our
23  work for example, diners, restaurants, supermarkets, subways, and railroad.

24

25     32.    As a result of Binder & Binder's high level of competence and
26  experience, extensive advertising and promotion of their services under the Binder &
27  Binder marks,  Binder & Binder has acquired an excellent reputation and the Binder &

28

1  Binder Marks have become famous among consumers in need of social security

2  disability benefit services as signifiers of excellent service and advocacy.

3

4      33.    I discovered the Defendants' use of Binder & Binder's trademarks in

5  November, 2006 upon receiving an e-mail from an employee of Binder & Binder, Yiu

6  Hang Mui.  The e-mail indicated that a Binder and Binder employee Lori Lembeck

7  conducted a search for binder and binder as a keyword and another company's name

8  showed up on the sponsored search with the title "Binder And Binder".  Mr. Mui

9  further indicated that he did a search with the keywords "Binder and Binder" and the

10  same company comes up on the sponsored sites as well.  Additionally, the e-mail

11  provided the contact information for the company name that showed up on the

12  sponsored search.  It indicated that the company's website was

13  www.socialsecuritydisability411.com and they had the telephone numbers of 800-248-

14  1100 or 1-888-236-3348 and that the company name was the Disability Group, Inc.

15  (DGI) with an address of is 2530 Wilshire Blvd., Suite 200, Santa Monica, CA, 90403,

16  with the President Ronald Miller.  Subsequently, I also received an e-mail from

17  another employee of Binder and Binder, Mario Davila, which indicated that he had

18  called the 800 number and the receptionist answered "The Disability Group".  Mr.

19  Davila asked if this was Binder and Binder and was told that it was not and he had

20  explained that he had reached the website by clicking on the link entitled Binder and

21  Binder on Google.  He said that he was told by Vanessa, the receptionist that because

22  Binder and Binder was a big firm, Binder and Binder sends them our disability cases.

23  They advertise for Binder and Binder and Binder and Binder send them cases.  He said

24  he then asked for the contact information for Binder and Binder and was placed on

25  hold for four minutes and given Binder and Binder's website as a contact.  A true and

26  correct copy of the e-mails are attached to the Appendix of Evidence as Exhibit 3 .

27  Disability Group, Inc. and Ronald Miller have never been authorized or licensed by my

28  brother or I to use the Binder and Binder Marks.  Moreover, Disability Group, Inc.

11

1  does not advertise for Binder and Binder, nor has it ever been authorized to do so.

2  Furthermore, Binder and Binder does not send disability cases to Disability Group, Inc.

3

4      34.   As a result of receiving the e-mail, I telephoned Ronald Miller to

5  complain of his company's use of our name.  During that conversation Miller said that

6  his firm purchased the keywords and displayed the heading because of the high volume

7  of hits to Binder & Binder's website.

8

9      35.   Lastly, I am familiar with the policies and procedure of Binder & Binder.

10  The employees on Binder & Binder's staff, as part of their duties, records notes of

11  telephone conversations they have with customers in the Work Log as they come in.  I

12  am a custodian of these records of Binder & Binder, and each of the records attached

13  to the Appendix of Evidence as Exhibit 4 is a true and correct copy of an original

14  record in the custody of Binder & Binder.  I am familiar with the policies and

15  procedures of Binder & Binder as they relate to the documents attached to the

16  Appendix of Evidence as Exhibit 4.  Pursuant to Binder & Binder's policies and

17  procedures, the records attached to the Appendix of Evidence as Exhibit 4 were made

18  at or near the times of the occurrence of the matters set forth in the documents by a

19  person who had knowledge of the matters set forth in them, and the person who made

20  the records was under a duty to record events accurately and correctly in the records.

21  Recording the type of information set forth in the attached records is a regular practice

22  of the employees of Binder & Binder and the attached records are kept in the course of

23  a regularly conducted business activity of Binder & Binder.  If such records are not the

24  originals, such records are duplicates of the originals.

25

26

27

28

1

2       I declare under penalty of perjury under the laws of the United States of

3  America that the foregoing is true and correct. Executed this 25th day of July,

4  2008.

5

6

7

8

9                                   Harry J. Binder

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

DECLARATION OF HARRY J. BINDER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT B

1  Ronald D. Miller (SBN 170221)
   (rmiller@disabilitygroup.com)
2  Matt Kohn (SBN 97660) of Counsel)
   (mattkohn@msn.com)
3  2917 Santa Monica Blvd
   Santa Monica, CA 90404
   Telephone: (310)829-5100
4  Facsimile:  (310)829-0010

5  Attorneys for Defendants

6

7
                    UNITED STATES DISTRICT COURT
8
        FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
9

10
   HARRY J. BINDER, an individual; and        ) **Case No.: CV 07-02760-GHK (SSx)**
11 CHARLES E. BINDER, an individual, et       )
   al.                                        )
12                                            )**DECLARATION OF**
              Plaintiffs,                      )
13                                            )**RONALD MILLER**
           vs.                                )
14                                            )**OPPOSITION TO BINDERS'**
   DISABILITY GROUP, INC., a corporation;)**MOTION FOR PARTIAL**
15 RONALD MILLER, an individual; and          )**SUMMARY JUDGMENT**
   DOES 1 to 10, inclusive,                   )
16                                            )
              Defendants.                      )
17                                            )
                                              )Date:
18                                            )Place: Courtroom 650
                                              )       Roybal Federal Building
19                                            )       255 East Temple Street
                                              )Time:  hearing to set by court, if any
20                                            )Trial: none

21

22

23

24

25

26

27

28

1

## DECLARATION OF RONALD D. MILLER

2       I, Ronald D. Miller, declare:

3

4       1.      I have personal knowledge of the facts in this declaration (in opposition

5   to Binders' motion for partial summary judgment). I am a U.S. citizen and the subject

6   business located in Santa Monica. If called as a witness, I would competently testify,

7   as follows:

8

9       2.      I am an active member in good standing with the State Bar of California.

10  I founded Disability Group, Inc. ("Disability") as a California corporation in April

11  2004. Disability's principal office is in Santa Monica. Disability is a law firm. I

12  started Disability with personal funds. I am the sole owner and director. My title is

13  managing director. We provide social security disability benefits legal services

14  throughout the United States. We do not have field or satellite offices outside

15  California. Disability has full and part-time employees, all of whom work in our

16  office in Santa Monica.

17

18      3.      2004 to 2005, Google search engine optimization opportunities were

19  rapidly developing. We started Disability with the belief there is opportunity in the

20  internet marketing space for a law firm that is able to reach consumers who would not

21  otherwise know how to find affordable specialty legal services. At the outset, our

22  focus was how much was being spent by law firms on advertising in the Los Angeles

23  area.  One Nielson ratings service report was shown to me by an advertising agency

24  as an indication of ad spending. The category in the report was broadly defined as

25  legal services and it listed Binder & Binder. Our aim was to advertise primarily on

26  the internet.

27

28

1

2

3      4.      We have been asked during this lawsuit whether I saw, heard, read, or

4  followed Binders' advertising campaigns on television, radio, print (including

5  website design and function). I never did. We saw Binders' advertising presence

6  through their internet ads on Google.com We were trying to identify how the

7  consumer used internet search engines for social security disability information. And,

8  this is distinctly different from how the consumer might behave when they arrive at a

9  website. We wanted to know what internet advertisers in the social security space

10  were writing.

11

12      5.      The core of this case is the Google AdWords advertising program (the

13  terms AdWords and keywords are interchangeable). The basis of Binders' trademark

14  complaint are consumers who might have retained Disability using certain keywords

15  on Google.  Binder's trademark claim is about fees that were supposedly lost as a

16  result of keyword use on Google (that is, whether Disability had actual notice of

17  Binder's trademark registrations).

18

19      6.      (Appendix of Evidence Vol. II Exhibit 30 are true copies of major search

20  engine pages.) They were generated at my direction for the purpose of showing

21  Binder did not give actual notice of trademark registration (e.g., with an "R" in-a-

22  circle) to Disability. Binder did not give notice that its marks are registered by

23  displaying with the mark words or symbols of registration in any of its internet

24  advertisements. Binder did not protect its trademarks by giving actual notice of

25  registration on the internet ad space. Exhibit 30 is summarized below:

26

27

28

1

2

**Exhibit 30**

3

| Search Engine | Keyword Query Used | Internet page showing no ® |
|---|---|---|
| Google | binder and binder | No ® notice |
| Google | binder binder | No ® notice |
| Yahoo! | binder | No ® notice |
| Yahoo! | binder and binder | No ® notice |
| Yahoo! | binder binder | No ® notice |
| Microsoft | binder and binder | No ® notice |
| Microsoft | binder binder | No ® notice |
| Microsoft | binder | No ® notice |
| Ask.com | binder and binder | No ® notice |
| AOL | binder and binder | No ® notice |
| AOL | binder | No ® notice |
| Dogpile.com | binder and binder | No ® notice |
| Dogpile.com | binder | No ® notice |
| Dogpile.com | binder binder | No ® notice |
| Yellowpages.com | Binder Binder | No ® notice |
| Find Law.com | Binder & Binder | No ® notice |
| WhitePagescom | Binder & Binder | No ® notice |
| YellowBook.com | Binder & Binder | No ® notice |
| | | |
| **Other seacrhes:** | | |
| Google | Kleenex | Kleenex® |
| Google | Thermos | Thermos® |
| Google | Band Aid | BAND-AID® |
| Google | Jeep | Jeep® |

20

21    7.    Google AdWords are controlled by Google. And, this distinction is an
important one. Google controls how AdWords are used, but Binder can prevent the
misuse of AdWords by giving simple notice to other advertisers and consumers.
Binder did not take advantage of Google's trademark protection policy and procedure
(see, below). Google allows the trademark owner to eliminate the possibility that
competitors use an owner's trademark as keywords. Also, Disability never received a
cease and desist letter from Binder pertaining to its trademarks.

8.    Binder has no California trademark registration. (Attached to Appendix of Evidence Vol. II as Exhibit 31 are official records of California Secretary of State). When we were served with this lawsuit, I directed a search of California Secretary of State for trademark/service mark filings for "Binder & Binder" and/or "Binder and Binder." California has no trademark application or registration recorded for either mark.

9.    Disability never included the word "Binder" in metatags on our websites. Nor did Disability ever use the word Binder in any of its websites. The internet is the largest collection of information in the history of the world. Google's internet search tools (or engines) use sophisticated proprietary algorithm technology to help consumers find what they are looking for. Algorithms gauge relevance of an ad search. Metatags are HTML code that describes the content of a website. They can be used to gauge relevance, too.

10.    Google gives people who search the internet typically many results according to how relevant Google's proprietary algorithm predicts each page (ad positioning). Google provides its search engine to users for free. Google allows companies to place paid advertisements on Google's results pages. Google controls the targeting of ads to what consumers are looking for. As a result, consumers searching for "used autos" will find ads related to "cars" not "cosmetics."

11.    Google allows advertisers to bid for the right to have their ads appear when consumers search for particular terms. Google allocates space (ad positioning) according to an auction scheme that ranks ads based on the advertiser's bids as well as Google's automated assessment of the relevance or quality of the ads. The

1  consumer wants to get to the first level of results, see all relevant ads, and not need to
2  redo the search procedure.

3

4      12.    Binder never took advantage of Google trademark protection services
5  which (for the consumer) is designed to lessen the possibility that ads might confuse
6  consumers. For advertisers, it guarantees a competitor is not able to bid on another's
7  trademark or use it as an AdWord. Google implements a filtering system to ensure
8  that the trademark term does not appear in keywords and in the text of related ads.
9  Google's protection prohibits clearly lawful uses of a trademark term in comparative
10 advertising ("4-out-of-5 doctors prefer X") and prohibits truthful advertising
11 trademark goods for sale ("Buy X here"). Had Binder used Google's trademark
12 protection service, Disability's webmasters would have avoided this lawsuit.

13

14     13.    Disability never represented itself in any website, advertisement,
15 publication, or verbally to anyone, that it is an affiliate, partner, sub-set, division,
16 department, or subsidiary of Binder. Or, that Binder in any way sponsors or endorses
17 Disability. Disability owns two URL's associated with the same two websites:
18 www.socialsecuritydisabilityhelpcenter.com ("HelpCenter") and
19 www.disabilitygroup.com ("Disability Website"). Binder's website is a click of
20 www.binderandbinder.com. Neither "HelpCenter" or "Disability Website" bear any
21 resemblance whatsoever to Binder's web address (URL), Binder's website design and
22 content, and Binder's trademarks. Disability's websites and web addresses do not
23 bear any resemblance to Binder's URL and website, or to its trademarks. Disability's
24 websites never contained Binder trademarked terms or have any direct or indirect
25 reference to Binder. Disability never needed a disclaimer on either website (e.g.,
26 'Disability is not affiliated with Binder') because its websites do not mention
27 Binder's name or mark. Disability's toll free telephone number (1-888-BENEFIT) is

28

1   in no way similar to Binder phone number (1-800-662-4633). The design and look of

2   Disability's websites do not resemble Binder's. Disability's websites do not contain

3   any statement which might cause confusion as to who was actually providing the

4   legal services to the consumer. Disability's 1-page Fee Agreement has 12 sentences

5   and contains the words "Disability Group" 8 times (see paragraph 28 below).

6

7       14.    This case involves only "188" submissions and 18 retained cases.

8   Binder's survey includes the names of the "188" consumers who Disability turned

9   over in its initial disclosures. These "188" made submissions to Disability. 18 became

10  retained cases. The "188" found Disability on Google between Mar. 27 to Nov. 2

11  (2006) using Google AdWords program.

12

13      15.    10 of the "188" offer evidence here. An appreciable 171 super majority

14  are a missing contra evident. Each consumer reached the first level Google results

15  page. On any day from Apr. to Oct. the "188" would have seen and able to identify

16  two internet advertisers lined up in front of them on Google. They all would have

17  able to see www.binderandbinder.com and www.disabilitygroup.com among many

18  others listed.

19

20      16.    Disability did not mislead, improperly misdirected, diverted, or lure any

21  consumer to choose disabilitygroup.com over binderandbinder.com. (Appendix of

22  Evidence Vol. II Exhibit 32 is a Google "Sponsored Links" results page taken

23  5/10/07). Exh. 32 is accurate representation what consumers saw on Google

24  throughout 2006. It is the reverse scenario where Binder actually bid for the right to

25  have its own Google ad appear when consumers search the term "Disability Group."

26  Binder purchased AdWords "Disability Group" and its ad was positioned

27  prominently above the Disability ad. In this example, we typed search term

28

1  "Disability Group" because that is who we were looking for.  The ads demonstrate

2  how Google positioned our respective ads in 2006. The consumer had to overlook

3  Binder's higher-up positioned ad in order to click the Disability ad. For the person

4  who always use "the top one", he would have chosen www.binderandbinder.com.

5  Either way, the consumer still found what he is looking for – possibly a list of related

6  websites. He found www.binderandbinder.com.

7

8

9  **Exhibit 32**

10  **Google results page generated on 5/10/2007.**
    **Search query typed "Disability Group."**
11  **Results page positioning where both ads are Sponsored Links.**

12

13  <u>Soc. Security Disability</u>
    www.binderandbinder.com   Free Disability Evaluation Get
14  Immediate Help Now.

15  <u>Business Insurance Quotes</u>
    LowQuotes.com   Free Quotes & Low Cost Policies. Compare Rates
16  In California Now!

17
    <u>Disability Group, Inc.</u>
18  DISABILITY GROUP. Disabled? Social Security. Free no-obligation
    consultation No fee unless you win. Immediate benefit assistance for
19  disability.
    www.disabilitygroup.com
20

21

22

23  17.    In 2006, the "188" saw Binder's Google ad in the top position and

24  proceeded to click Disability's ad in the lower position. The "188" were not mislead,

25  misdirected, diverted, or lured into choosing disabilitygroup.com over

26  binderandbinder.com.

27

28

1  18. The "188" were not pressured by Disability in making any choice at all.

2  Neither were the "188" prevented by Disability from examining both websites and

3  then returning to the same Google page by hitting the "return" key. Neither were the

4  "188" diverted to Disability. Because, they found what they were looking. Right at

5  the top in the number one position. Neither were the "188" lured by the wording of

6  the ads (that is, by clicking www.disabilitygroup.com they could obtain Binder legal

7  services or vise versa).

8

9  19. 62 clicks, $53.08, and the majority of the clicks were by Binder people

10  over-reacting to a condition that Disability knew nothing about. (Appendix of

11  Evidence Vol. II Exhibit 19 is a Google "Sponsored Links" results page 11/2/06).

12  The facts about Exh.19 have been blown out of all sensible proportion. The Google

13  ad on that page cost $53.08 in Google click fees. The ad was not owned, created, or

14  controlled by Disability. Mr. David Dimas created the ad. The ad was placed on

15  11/2/06 and also was removed on 11/2/06. It was never displayed on Google before

16  or after 11/2/06. He spent the $53.08 of his own money experimenting on the ad.

17  He never sought reimbursement from Disability. Disability's credit card account was

18  not used for this Google account. No potential client was retained by that ad.

19

20  20. Mr. David Dimas was one of two contract webmasters for Disability.

21  Mr. Dimas owns companies named Webpositionadvisors.com and LegalHelpCenters,

22  which he runs out of his house. Mr. Dimas was originally hired to build "HelpCenter"

23  and later for search engine testing. Mr. Dimas' was asked to run keyword tests

24  against "Disability Website" built by another webmaster Mr. Michael Vincent.

25  Disability assigned Mr. Dimas to test words to determine whether there is a more cost

26  effective way of getting consumer inquiries for people seeking a social security

27  lawyer. Mr. Dimas' job was to test "HelpCenter" against "Disability Website" to

28

1  determine lowest cost-per-click. He would take a few keywords to see the click-

2  through-ratio ("CTR") on a particular ad. The cost difference can be

3  disproportionately high to a small firm; that is, paying $.40 per click versus $2.75 per

4  click, with thousands of clicks at stake, is a significant amount to a start-up.

5

6      21.    We did not know the Adwords Mr. Dimas was selecting. We never told

7  Mr. Dimas which AdWords to purchase. We never directed Mr. Dimas specifically to

8  use "Binder" as keyword. Mr. Dimas selected "Binder" through Overture software

9  utility to show him a listing of keywords which included "Binder." We would meet

10  by speaking on the phone. We did not receive or look at pages of reports or examine

11  obscure notations. He did not mail them to us. If the reports were contained in locked

12  e-mail files, I did not open them. When we discussed assignments, I told Mr. Dimas

13  just to give me the big picture what he found out. Attached to the Appendix of

14  Evidence Vol. II as Exhibit "O" are excerpts of Mr. Dimas' deposition):

15

16                                 **EXHIBIT "O"**

17      **Deposition (vol. II) of David Dimas taken June 8, 2008**

18      at page 135:10-18

19      **Q.** You hade testified on February 1st that you thought you got the

20      Binder and Binder keywords from Overture type search. Are you

21      certain of that sitting here today?

22      **A.** I'm pretty certain of it, yes.

23      **Q.** Are you sure that you didn't get it from looking at this Exhibit 56

24      (Keyword Density Report)?

25      **A.** No. We would have had to have had those words first before we

26      got these (reports).

27      at page 151:152

28

1
2
3
4
5
6
7

> Q. Is it your recollection in your conversation with Mr. Miller after you made these reports available that he said, I looked there, there's a lot there, can you just give me the eye level view?"
>
> A. Right.
>
> Q. But he did say he looked on there?
>
> A. I don't know what he did.

8    22.    Mr. Vincent was Disability's other webmaster. He operated the AdWord
9  program for "Disability Website" in 2006. We did discuss the use of many words and
10  "Binder" was among them. In total, from Apr. to Nov. (2006), Mr. Vincent spent
11  $1,226 (plus $339 more on "HelpCenter" site) on "binder" keywords, which is
12  documented in official Google Reports turned over to Binder in our initial
13  disclosures, when attorney fees in the case were also in the hundreds of dollars. For
14  perspective, Disability's Google AdWord expense from Apr. to Nov. 2nd (2006) was
15  $93,704.95. We turned these reports over to Binder during discovery. And, the top
16  performing Google AdWords purchased by Mr. Vincent for all times was simply the
17  word "disability" at a cost of $.99 per click. Mr. Vincent purchased hundreds of
18  keywords Apr. to Nov. 2nd and "binder" certainly one of them.
19

20    23.    Disability never owned URL www.socialsecuritydisability411.com
21  ("411 URL") and it was not a working website.
22

23    24.    Disability did not know Mr. Dimas created "411 URL" or that he
24  registered it in his own name and paid for it himself, using a separate Google account
25  and password. Disability was never able to access it. It had a separate Google account
26  with password. Mr. Dimas testified "411 URL" was a clone he created to compete on
27  AdWords conversions with our own "HelpCenter." Mr. Dimas created the heading or
28

1 title for the ad. We did not direct Mr. Dimas to create the ad heading, nor did we

2 approve it.

3

4      25.   The "411 URL" ad on Google was noticed 11/2/06 by Binder's Google

5 advertising director Mr. Yui Hang Mui, who then informed Mr. Harry Binder and

6 operations director Mr. Mario Davila on 11/2/06. Mr. Davila then initiated a

7 surreptitious telephone call to Disability on 11/2/06. Mr. Davila then emailed Mr.

8 Harry Binder on 11/2/06 (seen below). Harry Binder then telephoned and yelled at

9 Disability's receptionist and me on 11/2/06. (Attached to the Appendix of Evidence

10 Vol. II is Exhibit 3):

11

12

## EXHIBIT 3

13

**From:** Mario Davila
14 **Sent:** Thursday, November 02, 2006 10:50 AM
**To:** 'Hang Mui (Intranet)'; 'Harry J. Binder'
15 **Cc:** 'Charles E. Binder'; llembeck@mail. com
**Subject:** RE: Sponsored Search

16

        I called the 800# and the receptionist answered "The
17 Disability Group." I asked if this was Binder and Binder and told
it was not. I explained that I reached their web site by clicking
18 on a link titled Binder and Binder on Google and was told by
Vanessa the receptionist that because Binder and Binder is a big
19 firm, Binder and Binder sends them our disability cases. I then
asked for contact info for Binder & Binder. I was put on hold for
20 4 minutes and given our website as a contact.
21

22

23      26.   Disability's receptionist (Vannessa) answered the phone "The Disability

24 Group." She was then asked "is this Binder & Binder" and she said "no." She was

25 then asked "do you know how I can contact Binder & Binder" and apparently it took

26 a while to find out and give Binder's web address, which she did. Our employees

27 handled it on their own and did the objectively reasonable thing on their own.

28

1  Disability never advertised for Binder & Binder, and Binder would never send cases
2  to us. The reference to "big firm" was (highly probability) the largest U.S. law firm,
3  Jacoby & Meyers, who did refer cases to Disability.

4

5      27.    On 11/2/06, I was told by Vannessa some angry man is on the phone. I
6  took the call. Mr. Harry Binder yelled, *"you're bidding on my company's name on
7  the internet!"* It was not a conversation where I could reason with Mr. Binder. There
8  was no mention of trademarks. I told him I would look into it. I telephoned Michael
9  Vincent and asked him to quit bidding on Binder words. I phoned Mr. Dimas and told
10 him to take out any keywords containing Binder immediately.

11

12     28.    Clients sign a Fee Agreement and SSA Appointment of Representation.
13 None of the 10 consumers who appear here were asked the questions "if you intended
14 to click Binder & Binder ad, and you searched Google for "Binder and Binder," why
15 didn't you look for the Binder & Binder ad on the Google page" and/or "did you see
16 Binder & Binder ad on the Google page" and/or "did you look for Binder & Binder
17 ad on Google page" and/or "why did you choose Disability link over the Binder &
18 Binder link if the ads were right next to each other." Of the 4 retained cases/clients
19 (Addington Exh."Q"; Sellars Exh."R"; Battell Exh."S"; Williams Exh."T") all
20 admitted they knew they were hiring Disability Group and not Binder & Binder. They
21 all testified as follows:

22

23     **Q.** Does this appear to be the Fee Agreement you signed?
24     **A. Yes.**
25     **Q.** Was it ever your understanding that this (Fee Agreement) contains
26     an agreement of some kind between you and Ronald D. Miller?
27     **A. Yes.**

28

1    **Q.** Was it ever your understanding that this (Fee Agreement) contains

2    an agreement of some kind between you and Harry J. Binder?

3    **A. No.**

4    **Q.** Was it ever your understanding that this (Fee Agreement) contains

5    an agreement of some kind between you and Binder and Binder?

6    **A. No.**

7    **Q.** Was it ever your understanding that this (Fee Agreement) contains

8    an agreement of some kind between you and Disability Group

9    Incorporated?

10   **A. Yes.**

11   **Q.** Are you able to identify (this document) to be an Appointment of

12   Representation document pertaining to you and Ronald D. Miller?

13   **A. Yes.**

14   **Q.** Do you see on the top portion of the page the name "Ronald D.

15   Miller of Disability Group" that appears to be typed?

16   **A. Yes.**

17   **Q.** Was it ever your understanding that this (Appointment of

18   Representation) contains an agreement of some kind between you and

19   Harry J. Binder?

20   **A. No.**

21   **Q.** Was it ever your understanding that this (Appointment of

22   Representation) contains an agreement that you appointed Ronald D.

23   Miller as your attorney?

24   **A. Yes.**

25

26       29.    (Attached to the Appendix of Evidence Vol. II as Exhibit 24 is a

27   compilation prepared for litigation at Binder's request (see below). Binder offers

28

1   Exh. 24 to demonstrate Disability's Google campaign using Binder keyword was so

2   successful, it produced the highest numbers of cases Disability ever retained. Exh. 24

3   accurately represents the number of retained cases on a monthly basis (2005, 2006,

4   and 2007). Exh. 24 includes the 18 cases retained (using "Binder" keyword) between

5   Apr. to Oct. (2006). Apr. to Oct. there were 1,433 cases retained. 12 months prior

6   to Apr. to Oct. 1,756 cases retained. 12 months after Apr. to Oct. 2,418 cases

7   retained. Apr. to Oct. only 1.2% of Disability's cases retained used "Binder"

8   keyword.

9

10

### Exhibit 24

Disability's retained cases:

| Year | Month | Cases |
|------|-------|-------|
| 2005 | Apr | 62 |
|      | May | 83 |
|      | Jun | 82 |
|      | Jul | 119 |
|      | Aug | 151 |
|      | Sep | 151 |
|      | Oct | 164 |
|      | Nov | 177 |
|      | Dec | 173 |
| 2006 | Jan | 181 |
|      | Feb | 171 |
|      | Mar | 242 |
|      | Apr | 217 |
|      | May | 237 |
|      | Jun | 243 |
|      | Jul | 190 |
|      | Aug | 175 |
|      | Sep | 181 |
|      | Oct | 190 |
|      | Nov | 188 |
|      | Dec | 175 |
| 2007 | Jan | 212 |
|      | Feb | 156 |
|      | Mar | 197 |
|      | Apr | 168 |
|      | Jun | 216 |
|      | Jul | 167 |
|      | Aug | 203 |
|      | Sep | 222 |
|      | Oct | 297 |
|      | Nov | 191 |

030

1    I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct.
3
4  Dated this 22, day of November, 2008.
5
6
7                                    Ronald Miller
8                                    Ronald Miller
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

EXHIBIT C

032

# DECLARATION OF MARIO DAVILA

I, Mario Davila declare as follows:

1.      That I am an employee of Binder and Binder – The National Social Security Disability Advocates, LLC (hereinafter "Binder and Binder") located at 215 Park Avenue South, 6th Floor, New York, NY 10003.  My job title at Binder and Binder is Director of Executive Operations.  I have been employed by Binder and Binder for eleven (11) years.

2.      On November 2, 2006, I received an e-mail from a co-worker Yiu Hang Mui indicating that Lori Lembeck, another employee of Binder and Binder, conducted a search for binder and binder as a keyword and another company's name showed up on the sponsored search with the title "Binder And Binder."  In the same e-mail, Mr. Mui indicated that he did a further search with the keywords "Binder and Binder" and the same company came up.  Additionally, his e-mail indicated the company was Disability Group, Inc. at www.socialsecuritydisability411.com, it has telephone numbers 800-248-1100 or 888-236-3348, its address is 2530 Wilshire Blvd., Suite 200, Santa Monica, CA, 90403 and Ronald Miller is the President.  A true and correct copy of the e-mail from Yiu Hang Mui to Harry Binder, Charles Binder, Lori Lembeck and I is attached hereto as Exhibit 3.

14

3.      Shortly after receiving this e-mail I called the 800 number provided on the e-mail and the receptionist answered "The Disability Group". I asked if this was "Binder and Binder" and was told that it was not. I explained that I had reached their website by clicking on a link entitled Binder and Binder on Google and was told by Vanessa, the receptionist, that because Binder and Binder is a big firm, Binder and Binder sends Disability Group, Inc., its disability cases. She indicated that they advertise for Binder and Binder and Binder and Binder send them cases. I then asked for the contact information for Binder and Binder and was placed on hold for four minutes and was later given Binder and Binder's website as a contact.

4.      I entered the details of my conversation into an e-mail to Yiu Hang Mui, Harry J. Binder, Charles E. Binder and Lori Lembeck, a copy of which is attached hereto as Exhibit 3. I drafted this e-mail during or immediately after my conversation with Disability Group, Inc. I recorded the contents of my conversation accurately as it is my responsibility to do so in the ordinary course of my duties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ₂₄ day of ᴶᵘˡʸ, 2008.

MARIO DAVILA

15

# EXHIBIT 3

EXHIBIT 3 to MD Decl.

## Webadmin

**From:** Hang Mui (Intranet) [yhmui@mail.com]
**Sent:** Friday, December 01, 2006 1:04 PM
**To:** yhmui@mail.com
**Subject:** Mario's Conversation with California Firm

---

**From:** Mario Davila [mailto:mdavila@mail.com]
**Sent:** Thursday, November 02, 2006 10:50 AM
**To:** 'Hang Mui (Intranet)'; 'Harry J. Binder'
**Cc:** 'Charles E. Binder'; ilembeck@mail.com
**Subject:** RE: Sponsored Search

I called the 800 # and the receptionist answered "The Disability Group." I asked if this was Binder and Binder and was told it was not. I explained that I reached their website by clicking on a link titled Binder and Binder on Google and was told by Vanessa the receptionist that because Binder and Binder is a big firm, B&B sends them our disability cases. They advertise for B&B and we send them cases. I then asked for contact info for Binder and Binder. I was placed on hold for 4 minutes and given our website as a contact.

---

**From:** Hang Mui (Intranet) [mailto:yhmui@mail.com]
**Sent:** Thursday, November 02, 2006 10:37 AM
**To:** 'Harry J. Binder'
**Cc:** 'Charles E. Binder'; 'Mario Davila'; ilembeck@mail.com
**Subject:** Sponsored Search

Hi Harry, Charles,

Lori did a search for binder and binder rfc as the keyword and another company's name shows up on the sponsored search with the title "Binder And Binder". I did a search with the keywords "Binder and Binder" and they come up on the sponsored sites as well, but we come up on the natural search.

This is their website:

http://www.socialsecuritydisability411.com/
Number: 800-248-1100 or 1-888-236-3348
Company Name: **DISABILITY GROUP, INC. (DGI)**

**Address:**
2530 Wilshire Blvd. Suite 200
Santa Monica,
CA 90403

Ronald Miller, President

Better Business Bureau Number: 100003967

Click on the link below

http://froogle.google.com/froogle?q=binder+and+binder&hl=en&btnG=Search

BB 00604

Exhibit to MD Decl.

If the sponsored link does not come up, keep clicking on the Search button.

I have already sent out an email to Google reporting this issue.
Shall we contact them directly also?

Hang

BB 00005
037

12/1/2006

# EXHIBIT D

## DECLARATION OF JESSICA G. BOWER

I, Jessica G. Bower, declare and state as follows:

1.      I am currently employed by Galgano & Associates, PLLC, located at
20 W. Park Ave., Suite 204, Long Beach, New York, 11561. I have worked at
Galgano & Associates since December, 2005, initially part-time and summers as a
law clerk and currently as an Associate since being admitted to practice law in the
State of New York.

2.      Our office mailed a letter and survey dated March 25, 2008, to the
individuals with mailing addresses listed on DG 392 to DG 395. True and correct
copies of DG 392 to DG 395 are attached to the Appendix of Evidence as Exhibit 7
and a representative sample of the letters and surveys mailed to these individuals is
attached to the Appendix of Evidence as Exhibit 8. To those individuals who did
not send back a completed survey, our office mailed a reminder letter and survey
dated April 18, 2008, which was a copy of the March 25, 2008 letter stamped
REMINDER. Subsequently, our offices obtained additional mailing addresses for
the individuals listed on DG 392 to DG 395 whose addresses were not listed or
were incorrect, and mailed a letter and survey dated May 29, 2008 to these
individuals.

3.      Additionally, for those individuals listed on DG 392 to 395 whose
mailing addresses were not provided, we obtained on DG 396 to DG 399 a listing
of e-mail addresses. In April 2008, our office e-mailed letters and surveys to the
individuals with e-mail addresses listed on DG 396 to DG 399, with the exception
of the individuals who had already returned to us a completed survey. True and
correct copies of DG 396 to DG 399 are attached to the Appendix of Evidence as
Exhibit 9 and a representative sample of the letters and surveys e-mailed is attached
to the Appendix of Evidence as Exhibit 10.

4.      Our office received back completed survey responses via mail and e-
mail and narrative e-mails without a completed survey from the individuals who

18

1   received the letters and surveys. Attached to the Appendix of Evidence as Exhibit

2   11 are true and correct copies of the completed survey responses and narrative e-

3   mail responses without a completed survey, which were forwarded to our office.

4   Our office also received letters and e-mails which were returned as undeliverable.

5       5.      Our office tallied the number of individuals who we sent a letter and

6   survey to, either by mail and/or e-mail. Our office tallied the number of completed

7   survey responses received, narrative email responses received without a completed

8   survey, and the overall total number of responses received. Our office also tallied

9   the total number of letters and surveys which were returned as undeliverable.

10  Attached to the Appendix of Evidence as Exhibit 12 is a chart detailing these

11  results. Of the letters and surveys sent via mail and e-mail, 152 individuals'

12  surveys were not returned to us as undeliverable.

13      6.      As seen in Exhibit 12, our office received a total of 17 completed

14  surveys out of the 152 letters which were not returned as undeliverable.   We also

15  received 7 narrative letters in response without a completed survey. Our office

16  received a completed survey response rate of 11.18% (17/152). Our office received

17  a response either completed survey or narrative letter without a completed survey

18  24 times for an overall response rate 15.79 % (24/152).

19      7.      Our office tallied the results from the 17 completed surveys we

20  received. Attached to the Appendix of Evidence as Exhibit 13 is a chart which sets

21  forth the number of individuals who answered, YES, NO, that they did not know, or

22  provided no reply to each of the questions set forth in the survey.

23      8.      As seen in Exhibit 13, of the 17 completed surveys, all 17 (100%)

24  answered YES to the question: "Did you search through an internet search engine

25  for "binder and binder", "binder & binder" or "binder"?"

26      9.      As seen in Exhibit 13, of the 17 completed surveys, 16 individuals

27  (94.12%) responded YES to the question: "Did you believe that you had clicked on

28

1    a link, as a result of the search, which took you to Binder and Binder's website or a

2    website associated with Binder and Binder?"

3        10.    As seen in Exhibit 13, of the 17 completed surveys, 15 (88.24%)

4    responded YES to the question: "At the time you filled out the online submission

5    form, did you believe that you were submitting the form to Binder and Binder or

6    someone associated with Binder and Binder?"

7        11.    As seen in Exhibit 13, of the 17 completed surveys, 10 (58.82%)

8    responded YES to the question: "Did you retain any advocate as a result of your

9    internet search?"

10        12.    As seen in Exhibit 13, of the 10, who responded YES to the question:

11    "Did you retain an advocate as a result of your internet search?" 7 (70.0%)

12    answered YES to the question: "If YES, did you retain Disability Group, Inc.?"

13        13.    Of the 7, who responded YES to the question: "If YES, did you retain

14    Disability Group, Inc.?" 5 (71.43%) answered YES to the question: "Did you

15    believe you had retained Binder and Binder or someone associated with Binder and

16    Binder?" Furthermore, a total of 11 individuals answered YES to this question,

17    irregardless of whether they answered that they had retained Disability Group, Inc.

18    as a result of the search.

19        14.    As seen in Exhibit 13, of the 17 who responded to the survey 5

20    (29.41%) answered YES to the question: "Were you ever told by the advocate that

21    the advocate you had retained was Binder and Binder or was somehow associated

22    with Binder and Binder?"

23        I declare under penalty of perjury under the laws of the United States of

24    America that the foregoing is true and correct.

25

26    Dated: July 28 , 2008

27        JESSICA G. BOWER

28

20

DECLARATION OF JESSICA G. BOWER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT E

042

1

## **DECLARATION OF KENNETH G. PARKER**

2

I, KENNETH G. PARKER, declare:

3     1.     I am an attorney licensed to practice under the laws of the State of

4 California and am co-counsel of Plaintiffs in the within action.

5     2.     I have personal knowledge of the following facts, and if called as a

6 witness, could and would completely testify to them.

7     3.     On July 9, 2008, I spoke to Matt Kohn to conduct a conference

8 pursuant to local rules. We discussed the causes of action and issues regarding

9 which plaintiffs intended to file a motion for summary judgment. On July 30,

10 2008, I filed a motion for summary judgment and supporting papers. The motion

11 was stricken for my failure to comply with this Court's joint filing process. After

12 the parties filed a stipulation, this Court extended the summary judgment filing

13 cutoff to permit a joint filing pursuant to this Court's order regarding summary

14 judgment motions. On October 16, 2008, I sent Mr. Kohn a draft joint

15 memorandum of points and authorities and appendix of undisputed facts. All

16 citations in the memorandum and statement were to evidence previously filed with

17 the court and served on July 30, 2008. On November 10, 2007, Mr. Kohn and I met

18 in person to meet and confer and discuss the substance of the motion and

19 documents, assembly of the appendices, and so on.

20     4.     Attached to the Appendix of Exhibits as Exhibit F is a true and correct

21 copy of the Declaration of Joyce Sneden.

22     5.     Attached to the Appendix of Exhibits as Exhibit G is a true and correct

23 copy of the Declaration of Michael Vincent, which was also marked as Exhibit 7 to

24 Mr. Vincent's declaration.

25     6.     Attached to the Appendix of Exhibits as Exhibit H is a true and correct

26 copy of the Declaration of David Dimas.

27

28

1      7.     Attached to the Appendix of Exhibits as Exhibit M are true and correct

2   copies of certain pages from the certified transcript of the deposition of Ronald

3   Miller, Volume I, conducted on November 12, 2007.

4      8.     Attached to the Appendix of Exhibits as Exhibit N are true and correct

5   copies of certain pages from the certified transcript of the deposition of David

6   Dimas, Volume I, conducted on February 1, 2008.

7      9.     Attached to the Appendix of Exhibits as Exhibit O are true and correct

8   copies of certain pages from the certified transcript of the deposition of David

9   Dimas, Volume II, conducted on June 10, 2008.

10      10.    Attached to the Appendix of Exhibits as Exhibit P are true and correct

11   copies of certain pages from the certified transcript of the deposition of Michael

12   Vincent.

13      11.    Attached to the Appendix of Exhibits as Exhibit Q are true and correct

14   copies of certain pages from the certified transcript of the deposition of Mary Ann

15   Addington.

16      12.    Attached to the Appendix of Exhibits as Exhibit R is a true and correct

17   copy of certain pages from the certified transcript of the deposition of Karen Funk

18   Sellars.

19      13.    Attached to the Appendix of Exhibits as Exhibit S are true and correct

20   copies of certain pages from the certified transcript of the deposition of Herb

21   Battell.

22      14.    Attached to the Appendix of Exhibits as Exhibit T are true and correct

23   copies of certain pages from the certified transcript of the deposition of Barbra

24   Williams.

25      15.    Attached to the Appendix of Exhibits as Exhibit U is a true and correct

26   copy of certain pages from the certified transcript of the deposition of Mamon

27   Trotter, Jr.

28

16. Attached to the Appendix of Exhibits as Exhibit V is a true and correct copy of certain pages from the certified transcript of the deposition of Iris Goldfaden.

17. Attached to the Appendix of Exhibits as Exhibit W is a true and correct copy of certain pages from the certified transcript of the deposition of Stacey Heinzman.

18. Attached to the Appendix of Exhibits as Exhibit X is a true and correct copy of certain pages from the certified transcript of the deposition of David G. Michael.

19. Attached to the Appendix of Exhibits as Exhibit Y is a true and correct copy of certain pages from the certified transcript of the deposition of Lynda L. Boileau.

20. Attached to the Appendix of Exhibits as Exhibit Z are true and correct copies of certain pages from the certified transcript of the deposition of Tiffany Gordo.

21. Attached to the Appendix of Exhibits as Exhibit AA are true and correct copies of certain pages from the certified transcript of the deposition of Jorge Rodriguez as person most knowledgeable for Disability Group, Inc. on certain topics.

22. Attached to the Appendix of Exhibits as Exhibit 14 is a true and correct copy of "Ron Miller Response to Requests for Admission."

23. Attached to the Appendix of Exhibits as Exhibit 15 are true and correct copies of pages printed from Google's website at www.Google.com.

24. Attached to the Appendix of Exhibits as Exhibit 16 is a true and correct copy of "Disability Group Response to Requests for Admission."

25. Attached to the Appendix of Exhibits as Exhibit 17 are true and correct copies of exhibits 2 through 5 from the deposition of Mr. Vincent, which were also produced by defendants as dg-195 to dg-201.

26. Attached to the Appendix of Exhibits as Exhibit 18 are true and correct copies of DG 365-368 and DG 373-386.

27. Attached to the Appendix of Exhibits as Exhibit 19 are true and correct copies of BB 00001-BB 000003.

28. Attached to the Appendix of Exhibits as Exhibit 20 are true and correct copies of [DG391-395].

29. Attached to the Appendix of Exhibits as Exhibit 21 are true and correct copies of DG411-DG414.

30. Attached to the Appendix of Exhibits as Exhibit 22 is a true and correct copy of the report entitled "Top Scoring Words," which was marked as Exhibit 59 in the second day of Mr. Dimas' deposition.

31. Attached to the Appendix of Exhibits as Exhibit 23 is a true and correct copy of the report entitled "Keyword Density Report," which was marked as Exhibit 56 in the second day of Mr. Dimas' deposition.

32. Attached to the Appendix of Exhibits as Exhibit 24 is a true and correct copy of dg 316.

33. Attached to the Appendix of Exhibits as Exhibit 25 is a true and correct copy of DG430.

34. Attached to the Appendix of Exhibits as Exhibit 26 is a true and correct copy of DG390.

35. Attached to the Appendix of Exhibits as Exhibit 27 are true and correct copies of pages printed from Disability Group's website at www.disabilitygroup.com.

36. Attached to the Appendix of Exhibits as Exhibit 28 are true and correct copies of DG 415-419.

37. All documents marked "dg" or "DG" were produced by Defendants in the ordinary course of this litigation.

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4    Dated: November 25, 2008

5                                    KENNETH G. PARKER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KENNETH G. PARKER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT F

1 | Kenneth G. Parker (SBN 182911)
kparker@tlpfirm.com
2 | Robert G. Loewy (SBN 179868)
rloewy@tlpfirm.com
3 | TRUTON, LOEWY & PARKER, LLP
3121 Michelson Drive, Suite 250
4 | Irvine, California 92612
Telephone: (949) 442-7100
5 | Facsimile: (949) 442-7105

6 | Attorneys for Plaintiffs
HARRY J. BINDER & CHARLES E. BINDER

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | HARRY J. BINDER, an individual; and )  Case No.: CV 07-02760-GHK (SSx)
CHARLES E. BINDER, an individual, )

12 | )
Plaintiffs, )  DECLARATION OF JOYCE

13 | )  SNEDEN
)

14 | vs. )
)

15 | DISABILITY GROUP, INC., a corporation; )
RONALD MILLER, an individual; and )

16 | DOES 1 to 10, inclusive, )
)

17 | Defendant.

18

19

20

21

22

23

24

25

26

27

28

049

1 **DECLARATION OF JOYCE SNEDEN**

2 I, Joyce Sneden, declare as follows:

3 1. I am an employee of Binder and Binder-The National Social Security Disability
4 Advocates, LLC (hereinafter "Binder and Binder"), located at 300 Rabro Drive, Hauppauge, NY,
5 11788. My job title at Binder and Binder is Call Center Manager. I have been employed by Binder
6 and Binder for about 14 years.

7 2. On January 8, 2008, a person who identified himself as Timothy Traczyk called Binder
8 and Binder and insisted that he was a client of Binder and Binder. The Binder and Binder telephone
9 operator searched by name, telephone number and social security number and could not locate Mr.
10 Traczyk as a client. The operator forwarded the call to me to investigate further.

11 7. Mr. Traczyk told me that he believed he was a client of Binder and Binder. He told me
12 that he lives in Ohio and had called the phone number for Binder and Binder and the person he was
13 directed to advised him that they handled the Binder and Binder overflow.

14 9. Mr. Traczyk said he had signed a retainer agreement with the entity he had called. I
15 asked Mr. Traczyk to locate his paperwork and to call back.

16 11. Mr. Traczyk called back on January 8, 2008 and I spoke to him. Mr. Traczyk told me
17 that after locating his paperwork that he was being represented by Disability Group, 2197 Santa
18 Monica Blvd., Santa Monica, CA. 90404 with the phone numbers of 310-829-5100 and 888-
19 BENEFITS.

20 13. He told me that he was angry at Disability Group and did not want to be represented by
21 Disability Group but by Binder and Binder. I recorded notes in the Client and Work Log
22 Information and made additional handwritten notes about the conversation I had with Mr. Traczyk,
23 a copy of which is attached hereto as Exhibit A. I recorded these notes during, or immediately after
24 the conversation and recorded them accurately, as it is my duty to do in the ordinary course of my
25 duties.

26

27

28

**DECLARATION OF JOYCE SNEDEN**

050

1    I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3    January 18, 2008

          Joyce Sneden

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOYCE SNEDEN                    051

# EXHIBIT G

## DECLARATION OF MICHAEL VINCENT

1.    I, Mike Vincent, declare I have personal knowledge of the facts presented in this declaration and if called to testify, I could competently do so.

2.    My full name is Michael Scott Vincent. I am partner-member of my company, named AXSEN LLC, whose address is 5472 Black Avenue, Pleasanton, California 94566. I was told that there is a lawsuit filed against Disability Group, Inc. pertaining to trademarks. I am not a lawyer and I am not familiar with trademark law as it is written, or am I familiar with the specific requirements of trademark law. I am generally familiar with trademarks and know a trademark when I see one in writing.

3.    My company business is engaged primarily in selling website templates.

4.    In March 2004 my company sold a website template to Disability Group, Inc.

5.    Disability Group, Inc. is my company's client and all agreements and work performed was contracted and billed to Disability Group, Inc.

6.    My company has only been paid by Disability Group, Inc. using business credit card transfer.

7.    My company's primary contact at Disability Group, Inc. was and is Ron Miller, as managing officer of Disability Group, Inc.  My company has never done business with Ron Miller as an individual.

8.    My company was contracted by Disability Group, Inc. to set up the interface for its initial pay-per-click advertising campaign for the site and we agreed to do the work.  As an accommodation, my company performed pay-per-click advertising management services, too.

9.    I conducted research using Google's on-line help feature for Google's Advertising Program. My research included selection of Keywords using Google's Advertising Programs.

Page 1 – Mike Vincent Declaration

1

EXHIBIT 7
FOR I.D.
WITNESS: M. Vincent
DATE. 8-24-07
SHARON E. 

053

10. I am generally familiar with the basic terms, conditions, and guidelines of Google's Advertising Program, including Keyword usage.

11. In my profession, I find that because the technology is sophisticated and changing rapidly, I generally must rely on Google to process our work in a legally responsible and legitimate way.

12. My company has never hired an attorney to review Google's Ad Word program.

13. In the course of managing Disability Group, Inc. Keyword bidding campaign, I submitted thousands of Keywords and Keyword combinations. In some cases I created these on my own and in other's I received suggestions from Ron Miller. Among many Keyword suggested, Ron Miller included the words "binder and binder." I submitted Keywords under the Google rules that existed at that time.

14. From March 26th to Nov. 2nd 2006, I submitted "binder and binder" as a Keyword in Google's bid process in the course of managing the Disability Group, Inc. account. At all times when I entered it, I used lower case. I never used capital letters "B" and never bid using an ampersand. My company never submitted Keyword "Binder And Binder," "Binder and Binder," "Binder & Binder," or "BINDER AND BINDER." Google's system states that the operational word "and" is unnecessary since Google includes that Keyword search term by default. I never bid on Keyword ampersand symbol ("&) in the bid process for Disability Group, Inc. at any time.

15. In my experience, Google has a policy of accepting appropriate Keyword search terms and rejecting inappropriate Keyword search terms.

16. I have personal experience that Google has rejected Keyword search terms which I in-put for my other clients; my company always complied with Google's requirements.

Page 2 - Mike Vincent Declaration 

17.   I have no knowledge or experience, or do I believe anyone outside Google knows why, how, when, and what criteria Google uses for acceptance and/or rejection of keyword search terms.

18.   On behalf of Disability Group, Inc., my company drafted and submitted to Google what people use to call "advertising copy." The term used today in Google is "Ad Text." My company never drafted or submitted "Ad Text" which includes or uses the words "binder and binder," "Binder And Binder," "Binder & Binder," or "BINDER AND BINDER."

19.   I never saw or so called 'visited' URL "binderandbinder.com" web site.

20.   At no time did I consult with Ron Miller how to set up the technical aspects of Disability Group's Google bid account.

21.   In my experience, if a person does a search using a specific company name, the search results might show the specific company name which was searched, as well as its competitors. This occurs very often. Nevertheless, the results would be understandable to the searcher, who could easily distinguish among the competing URLs he or she desires to freely choose. In my experience, I searched the term "binder and binder" on Google and noticed other social security firms appearing in the sponsored links results.

22.   Prior to being notified of this lawsuit, I was not aware of any potential issue involving trademark names and Keyword usage. Prior to being notified of this lawsuit, my Google research only briefly included guidelines about following proper trademark usage in Ad Text.

23.   In 2006, when I submitted bids for Keywords on behalf of Disability Group, I was unaware of any trademarks for "binder and binder" or any variation thereof. I did see advertisements for "Binder & Binder" and they did not contain any trademark symbols. I did not see any relationship between the business name of "Binder & Binder" or "Binder And Binder" and a trademark of those names. I did

Page 3 - Mike Vincent Declaration 

3

not see trademark notices, "R" in-a-circle, for the words "Binder and Binder," or "Binder & Binder" on any Google search web page at any time. I was never aware that "Binder and Binder" or "Binder & Binder" were trademark terms. I would have noticed a trademark symbol had it been there next to "Binder and Binder" and/or "Binder & Binder". I did not see at any time, trademark notices "R" in-a-circle connected to the words "Binder and Binder" or "Binder & Binder" on any Google search result.

24.    I am aware of many examples of direct competitors selling products and services on the internet, where a search is made for specific company, and their competitors' (that is, another specific company) web sites appear as a sponsored search results. If for example, someone searching Google specifically for "Binder & Binder" and searches "binder and binder," they would see many web sites in native and sponsored results. If someone was searching "binder and binder" they are free to choose "Binder & Binder" and not Disability Group.

25.    On November 2, 2006, I received a phone call from Ron Miller asking me to discontinue bid on Keyword "binder and binder" My business records clearly show, that on that date I discontinued all Keyword bid of "binder and binder."

26.    I declare under penalty of perjury under the laws of the United States and State of California, the foregoing is true and correct, to the best of my personal knowledge.

27.    I executed this declaration July 19, 2007, at Pleasanton, California.

MICHAEL S. VINCENT

# EXHIBIT H

DECLARATION OF DAVID DIMAS

1.    I, David Dimas, declare I have personal knowledge of the facts
in this declaration and could and would competently testify thereto.

2.    I own my company Webpositionadvisor.com, whose address is
1808 Golden Oak Street, Thousand Oaks, California 91320.

3.    My primary business is internet advertising for the legal
profession.

4.    About September-October 2005 my company was hired by
Disability Group, Inc. to start creating an internet website, the
purpose of which was to test whether Disability Group's domain
name www.disabilitygroup.com, was producing cost effective results
in terms of consumer-turned-client inquiries. It was commonly
known to internet professionals that Google, Inc.'s AdWord pay-per-
click program often produces unpredictable results and ad expenses
can get out of control.

5.    At Ron Miller's request, I created a tested web site called
socialsecuritydisabilityhelpcenter.com and
operated its internet campaign. My assignment was
to advise the client whether it is spending too much or too little
money to obtain expected results.

6.    I am familiar with the guidelines of Google's Advertising
Program. During 2006, I was aware that law firms bid on each
others names. I was aware this was common practice in other

**DG429**

058

industries. I relied on Google and never hired an outside attorney to review Google's Ad Word program.

7.    I created my own list of keywords to test using proprietary methodology. Competitors' keyword lists are available for purchase from companies like www.keycompete.com but I did not do so on behalf of Disability Group. I do not share my methodology with my clients.

8.    Starting about March-April 2006, I drafted and began testing various Google ad text and keyword bidding for www.socialsecuritydisabilityhelpcenter.com and for the purpose of comparison with www.disabilitygroup.com. I did so at the direction of Ron Miller. I tested "binder and binder" as an AdWord heading. I did not create this ad text at the specific direction of Ron Miller, but Mr. Miller did not specify that I could not do so. I was aware that Google accepted appropriate AdWords and rejected inappropriate AdWords. In my experience, when I attempted to bid on words, that unbeknown to me turned out to be trademarked words registered as trademarks with Google, the words were automatically rejected by Google. In 2006 to present, Google blocked bidding on trademark names registered with Google. At no time did Google block my keyword bid on binder and binder. If Google blocked a bid on a trademarked name, I would have to submit a written request for an exemption. At no time did I request such exemption. I have no experience in internet advertising where a law firm trademarked its law firm name. In 2006, when I tested AdWords on behalf of Disability Group, I was not aware of any trademarks for "Binder &

**DG429**

059

Binder" or any variation. I was never aware that "Binder & Binder" or variation was a trademarked term. I helped Disability Group, Inc. determine that the domain name www.disabiltygroup.com was not performing discernibly different or better than the domain name www.socialsecuritydisability411.com.

9.    On November 2, 2006, I received a phone call from Ron Miller of Disability Group asking me to immediately remove the AdWords "Binder And Binder" which I did immediately after I hung up the phone.

10.    I declare under penalty of perjury under the laws of the United States the foregoing is true and correct, to the best of my personal knowledge.

11.    I executed this declaration January 5, 2008, at Thousand Oaks, California.

**DAVID DIMAS**

**DG429**

# EXHIBIT I

## INTENTIONALLY OMITTED

EXHIBIT I

# EXHIBIT J

Ronald D. Miller (SBN 170221)
  (rmiller@disabilitygroup.com)
Matt Kohn (SBN 97660) of Counsel)
  (mattkohn@msn.com)
2917 Santa Monica Blvd
Santa Monica, CA 90404
Telephone:  (310)829-5100
Facsimile:  (310)829-0010

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HARRY J. BINDER, an individual; and CHARLES E. BINDER, an individual, et al. | **Case No.: CV 07-02760-GHK (SSx)** |
| Plaintiffs, | **DECLARATION OF** |
| vs. | **JORGE RODRIGUEZ** |
| DISABILITY GROUP, INC., a corporation; RONALD MILLER, an individual; and DOES 1 to 10, inclusive, | **OPPOSITION TO BINDERS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Defendants. | Date:<br>Place:  Courtroom 650<br>Roybal Federal Building<br>255 East Temple Street<br>Time:  hearing to set by court, if any<br>Trial:  none |

DECLARATION: JORGE RODRIGUEZ - OPPOSITION TO MOTION - Page 1

063

## DECLARATION OF JORGE RODRIGUEZ

I, Jorge Rodriguez, declare:

1.    I have personal knowledge of the facts in this declaration. I am a U.S. citizen and am employed by Disability Group, Inc. located in Santa Monica. If called as a witness, I would competently testify, as follows:

2.    I am director of operations for Disability Group, Inc. ("Disability"). I joined Disability in April 2004. I am not an attorney. I report to the firm's head attorney Ronald Miller. Intake personnel report to a supervisor of the intake department. Intake personnel are also called case analysts. Intake supervisor reports to me. Disability also receives client/case referrals from big firms as Jacoby & Meyers. Street walk-ins are extremely rare. The front-office telephone receptionist is not an intake person. The receptionist does not report to me. The receptionist has no duties related accepting potential client cases. If the receptionist takes a call from a potential client, it is her/his job to transfer it to intake personnel. I also supervise case managers. A potential client gets transferred to a case manager after signing a Fee Agreement (and upon approval). The case manager gathers medical records and files the clients' initial application to Social Security Administration.

3.    Disability is vigilant and organized in all levels of management and customer care. In 2006, I would attend weekly intake personnel staff meetings. There were 6 of us. And, when I did not attend a meeting, the intake supervisor would report to me anything I needed to know or make a decision on. Intake personnel received special training. We gave each employee their own training manual to read, learned, and sign. The manual is constantly updated. The manual pertains to Disability employee rules of conduct, Social Security Administration rules, rules of eligibility of retained SSA cases, customer service, FAQ, ethical compliance, etc.

1  Part of the training was how to deal with confusion about who Disability is. The most

2  common confusion with potential clients we experience is people asking whether we

3  are actually the U.S. government Social Security Administration itself. The way our

4  intake people handle all such questions is if anyone asked whether we are anyone

5  other than Disability, we answer by explaining who we are and the background of

6  who we are; that we are a private law firm and have attorneys who handle social

7  security disability claims for individual clients. We do not mention anything about

8  competitors. If potential client asks specifically and names one of our competitors, we

9  tell them "no" that we are not such firm. And, nothing more.

10

11      4.      Intake personnel are the first people to review e-mails or submissions

12  over the internet. Potential clients who e-mail go directly to an intake person. Intake

13  personnel telephone the potential client and state they are calling from "The

14  Disability Group." Toll free telephone callers first go to the receptionist who answers

15  the phone "The Disability Group." Receptionist transfers the call to an intake person

16  and does not engage in disability related conversation. An intake person's first phone

17  call or e-mail contact to or from a potential client is to answer questions and to find

18  out whether the caller is seeking legal representation. Intake personnel have a

19  computer screen in front of them where they recorded caller information. The intake

20  person has a drop-down menu item called "Marketing Source" with a list of sources:

21  Google, Yahoo, AOL, MSN, several Yellow Page sources, local bar association,

22  client referral, family member, www.DisabilityGroup, Jacoby & Meyers. Intake

23  personnel confirm only "how did you hear about us" information. They confirm

24  where on the internet the caller originated their contact. They asked "what website

25  were you on." They asked "how did you get to the website that you were on" and/or

26  "how did you get to disabilitygroup.com."

27

28

1     5.     Retained clients have their next level of contact with a case manager for

2  the initial application with the SSA. This requires a form SSA-1696 to be signed. The

3  head of the firm is the attorney or record and signs the SSA-1696 form. Mr. Miller

4  signs all SSA-1696 forms on behalf of Disability. Case managers remain active after

5  a favorable decision by answering questions. The client may be contacted by the

6  Social Security Administration and need help to set up their payment schedule, for

7  example.

8

9     6.     Retained clients may at terminate (or drop) our services at any time for

10  any reason. Sometimes a retained client terminates and no one at Disability knows

11  why. The client may refuse to say why. It is Disability's policy to contact the client to

12  find out why. It is first done by telephone and then confirmed by letter. Disability has

13  an attorney, part of whose work load is to contact such clients. If a retained client

14  calls his case manager to drop a case, the call is transferred to the attorney.

15

16     7.     Disability turned over the names of 188 consumers who made inquiries

17  (sometimes called submissions) during Mar. 27 to Nov. 2 (2006). 18 cases were

18  retained. Binder attempted to survey all 188. 91% did not respond. 9% responded to

19  the survey. 3% were retained cases. Business records of client contact with Disability

20  are kept on computer. I have password access to the information as part of my

21  responsibilities.  Conversations with clients are taken down contemporaneously by

22  receptionist, case analyst, and/or case manager. These records are made during the

23  regular course of business and at the same time of the event being memorized and I

24  am familiar with this process and implemented it for the company. I oversea this

25  process. I am ultimately responsible for compiling, maintaining, storing, and

26  retrieving these records on behalf of Disability. Of the 10 people who gave testimony

27  here, we have no record of any of them stating (or our people stating to them) that

28

1  Disability ever represented itself as an affiliate, partner, sub-set, division, department,

2  or subsidiary of Binder. Or, that Binder in any way sponsors or endorses Disability.

3  The following summaries are taken from these business records.

4  ### 7.1. Retained Case Barbra Williams – Exhibit 'T'

5  Ms. Williams first contacted Disability 7/24/2006. She reported by internet

6  submission form that she is 55 years with uncontrolled diabetes, 2 cardiac stents,

7  congestive heart failure, arthritis in foot, cataracts, anemia. Based on the limited

8  medical information she supplied to our case manager, she was denied benefits

9  1/11/07. She ended by dropping services on 2/1/07 by making a phone call to

10  Disability Group. Disability had 26 separate contacts and attempts to contact client.

11  She was contacted by Disability via telephone and letter-head 17 times. She

12  telephoned Disability 9 times and reached the receptionist and the case manager. Ms.

13  Williams wrote in her survey response, "their services were sub par. I discontinued

14  the association & completed my appeal." Disability has no internal record to indicate

15  Ms. Williams was dissatisfied with our services. We know from Ms. Williams'

16  deposition testimony that she saw a number of disability firms' websites to choose

17  from when she clicked on Google search engine. Disability never represented to her

18  that we were anyone other than Disability.

19

20  **EXHIBIT 'T' – deposition of client Barbra Williams**

21  At Page 9-10 (without sacrificing context):

22  **Q.** So when the search page came up on Google, there were some

23  links, right?

24  **A.** Yes.

25  **Q.** And did you click on one of those?

26  **A.** I did.

27  At Page 11-12 (without sacrificing context):

28

1
2
3
4
5
6
7
8
9
10

> **Q.** When you sent their (paper work) back, were you still under the impression there was a relationship of some sort between Binder & Binder and Disability Group?
>
> **A.** They never said they were Binder & Binder, but I assumed it.
>
> At Page 13 (without sacrificing context):
>
> **Q.** Did they ever say anything about whether they were related to Binder & Binder?
>
> **A.** No, they never did.
>
> **Q.** Did you ever ask them?
>
> **A.** No.

11

12

### 7.2.    Retained Case Mary Ann Addington - Exhibit 'Q'

13    Ms. Addington first contacted Disability 7/16/2006. She reported by internet

14 submission form she was 61 years with chronic congestive heart failure, sleep apnea,

15 shattered right femur, peripheral vascular disease, pinched nerves, surgery in 6/06,

16 and in a wheelchair. She retained Disability and signed her Fee Agreement

17 7/17/2006. She was eligible for disability benefits based upon the medical

18 information she supplied to our case manager. She started to receive SSA benefits

19 without a couple of months. Disability had 14 separate contacts with the client. The

20 client wrote in her Binder survey response, "I simply assumed I was dealing with

21 Binder + Binder and Disability Group was the name they used." Disability has no

22 record to indicate Ms. Addington was dissatisfied with our services. We know from

23 Ms. Addington's deposition testimony that she saw more than one disability website

24 when she clicked on Google search engine. We do not know why or how she "ended

25 up" on Disability's website when Binder & Binder would have been displayed on the

26 same Google results page. We also know from her testimony that Disability never

27 represented to her we were anyone other than Disability.

28

1

2 **EXHIBIT 'Q' – deposition of client Mary Ann Addington**

3 At Page 9 (without sacrificing context):

4 **A.** I just went into Google and all I did was put in Binder and Binder.

5 And pressed "enter" and off we went.

6 **Q.** Then you clicked on a web site; right? And, what site did you end

7 up on?

8 **A.** Disability Group.

9 At Page 11 (without sacrificing context):

10 **Q.** Did you ever ask from the time that you first had contact with

11 Disability Group until the time that you got your benefits did you ever

12 ask them if they were associated with Binder and Binder?

13 **A.** I didn't.

14 **Q.** When they first called you after you submitted your form, did they

15 say anything about Binder and Binder in that phone call?

16 **A.** They did not.

17 At Page 15-16 (without sacrificing context):

18 **Q.** When you actually engaged them and they did work for you, were

19 you ever told that Disability Group handled the overflow of Binder

20 and Binder?

21 **A.** No.

22 **Q.** When you spoke to them prior to the time of you engaging them

23 did you tell then that you were actually seeking out Binder and

24 Binder?

25 **A.** No, I didn't.

26

27

28

1

### 7.3.    **Retained Case Herb Battell -  Exhibit 'S'**

2          Mr. Battell first contacted Disability by telephone on 6/13/2006.  He reported

3    he was 47 years diagnosed with Manic Depression, Bi-Polar, Anxiety, Tennis Elbow,

4    unable to use his hands and arms with a 5 lb. restriction. He retained Disability and

5    signed his Fee Agreement 6/14/2006.  After over a year, Mr. Battell was dropped.

6    Disability had 82 separate contacts with the client. Disability had 22 separate contacts

7    with the Social Security Administration on Mr. Battell's behalf. Disability mailed 20

8    letter-heads to Mr. Battell asking him to contact Disability. The client was non-

9    complaint. Mr. Battell wrote in his Binder survey response, "I don't believe they

10   stated direct affiliation, I was led to infer an affiliation, that "Disability Group" was a

11   subset or division of Binder + Binder." We know from Mr. Battell's deposition

12   testimony that he asked direct questions whether Disability Group was Binder and

13   Binder and Disability said no. Disability has no record Mr Battell was dissatisfied

14   with our services.

15

16   | **EXHIBIT 'S' – deposition excerpts of Client Herb Battel**

17   At Page 7-8 (without sacrificing context):

18   **A.** I just entered "Binder and Binder" on Google and hit "search" and

19   it popped up the list of responses.

20   **Q.** Okay. And then you clicked on one of those responses?

21   **A.** Always use the top one.

22   **Q.** And do you recall what web site you went to?

23   **A.** Disability Group is where I ended up going.

24   **Q.** And when was the first time you learned that Disability Group

25   and Binder and Binder were not related?

26   **A.** When I asked them direct questions, and they stated that they are

27   not Binder and Binder.

28

1

2    **7.4.    Retained Case Karen Funk Sellars -  Exhibit 'R'**

3    Ms. Sellars first contacted Disability on 8/21/2006. She reported by internet

4    submission form she was 53 years with osteoarthritis, carpal tunnel syndrome, neck

5    and low back problems, existing for almost 20 years. She retained Disability and

6    signed her Fee Agreement 9/1/2006.  Disability had 32 separate contacts with the

7    client. Ms. Sellars responded to Binder's survey that she 'was not told by Disability

8    that it was associated or affiliated with Binder and Binder.' Disability has no record

9    of Ms. Sellars being dissatisfied with our services.

10

11   **EXHIBIT 'R' – deposition excerpts of Client Karen Funk Sellars**

12   At Page 11-12 (without sacrificing context):

13   **Q.**  Were you ever told by Disability that you had retained Binder and

14   Binder or it was somehow associated with Binder and Binder?

15   **A.**  I don't think so. I don't recall, but I don't think so.

16   **Q.**  Did you ask them if they were Binder and Binder?

17   **A.**  No.

18   **Q.**  Did anyone at Disability Group ever say that they were affiliated

19   with Binder & Binder?

20   **A.**  Not that I recall.

21   **Q.**  Was there anytime that you indicated you were seeking Binder &

22   Binder?

23   **A.**  I don't think so. No.

24

25

26

27

28

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3

4  Dated this 22nd day of November, 2008.

5

6

7

8                                        Jorge Rodriguez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

## INTENTIONALLY OMITTED

# EXHIBIT L

## INTENTIONALLY OMITTED

EXHIBIT L

# EXHIBIT M

1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| HARRY J. BINDER, an individual; and CHARLES E. BINDER, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CASE NO: CV 07-02760-GHK (SSx) |
| DISABILITY GROUP, INC., a corporation; RONALD MILLER, an individual; and DOES 1 to 10, inclusive, | ) ) ) ) ) | |
| Defendants. | ) ) | |

VIDEOTAPED DEPOSITION OF RONALD MILLER

TAKEN ON MONDAY, NOVEMBER 12, 2007

Reported By:  Susan Starr Kokis

C.S.R. No. 11303

Job No. 13860

2

1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4

5

6       HARRY J. BINDER, an              )
        individual; and CHARLES E.       )
7       BINDER, an individual,           )
                                         )
8                Plaintiffs,             )
                                         )
9                   vs.                  )  CASE NO:
                                         )  CV 07-02760-GHK (SSx)
10                                       )
        DISABILITY GROUP, INC., a        )
11      corporation; RONALD MILLER,      )
        an individual; and DOES 1        )
12      to 10, inclusive,                )
                                         )
13               Defendants.             )
        _____)

14

15

16              VIDEOTAPED DEPOSITION OF RONALD MILLER,

17      taken before Susan Starr Kokis, a Certified

18      Shorthand Reporter for the State of California, with

19      principal office in the County of Los Angeles,

20      commencing at 11:01 a.m., Monday, November 12, 2007,

21      at the Law Offices of Teuton, Loewy & Parker LLP,

22      3121 Michelson Drive, Suite 250, Irvine, California.

23

24

25

RONALD MILLER

3

1    APPEARANCES OF COUNSEL:

2

3         FOR THE PLAINTIFFS:

4              TEUTON, LOEWY & PARKER LLP
               BY:   KENNETH PARKER
5              ATTORNEY AT LAW
               3121 Michelson Drive
6              Suite 250
               Irvine, California  92612
7              (949) 442-7100

8         FOR THE DEFENDANTS:

9              LAW OFFICES OF RONALD D. MILLER
               BY:   MATTHEW KOHN
10             ATTORNEY AT LAW
               844 25th Street
11             Santa Monica, California  90403
               (310) 828-6116

12

        ALSO PRESENT:
13
               DALE PETERSON, VIDEOGRAPHER
14

15

16

17

18

19

20

21

22

23

24

25

RONALD MILLER

4

1                            I N D E X

2

3    EXAMINATION BY                                    PAGE

4    MR. PARKER                                          6

5

6

7                           EXHIBITS

8    MARKED                                            PAGE

9    20    Search result dated 11-2-2006               45

10   21    Homepage from SocialSecurityDisability411.com49

11   22    DG Client Intake Sheet                       52

12   23    "Keyword Related Inquiries" document         57

13   24    "Keyword Related Inquiries" document         62

14   25    Service Mark Supplemental Register for       63
           Disability Group
15
     26    Trademark Report                             64
16
     27    Black-and-white document of Binder and Binder73
17
     28    Printout of Binder and Binder homepage       74
18
     29    DG Client Intake Sheet                       75
19
     30    Document                                     78
20

21                  UNANSWERED QUESTIONS

22                      Page   Line

23                      90      8

24                  INFORMATION REQUESTED

25                        None.

5

1        IRVINE, CALIFORNIA; MONDAY, NOVEMBER 12, 2007

2                      11:01 A.M.

3                        -oOo-

4

5              THE VIDEOGRAPHER:  Going on the record.

6    This is the videotaped deposition of Ronald Miller.

7    The time is 11:01 a.m.  Today's date is

8    November 12th, 2007.  This is the matter of Binder

9    et al. versus Disability Group, Inc., et al., case

10   number CV 07-02760-GHK.

11             This deposition is being taken at 3121

12   Michelson in Irvine, California.

13             My name is Dale Peterson.  I'm a

14   videotaped operator and public notary from Orange

15   County, California.                            11:02:04AM

16             Would counsel present please identify

17   yourself and state who you represent starting with

18   counsel for the witness.

19             MR. KOHN:  Matt Kohn.

20             MR. PARKER:  Ken Parker here for Charles   11:02:16AM

21   Binder and Harry Binder.

22             THE VIDEOGRAPHER:  And will the court

23   reporter please swear in the witness.

24   ///

25   ///                                           11:02:25AM

RONALD MILLER

6

| 1 | RONALD MILLER, | 11:02:25AM |

2          having been first duly sworn,

3       was examined and testified as follows:

4

5                    EXAMINATION                    11:02:25AM

6    BY MR. PARKER:

7       Q    Good morning, Mr. Miller.  Have you been

8    deposed before?

9       A    Yes.

10      Q    When was the last time that you were        11:02:40AM

11   deposed?

12      A    199- -- I think it was '92.

13      Q    Okay.  What -- what kind of case was that?

14      A    That was a -- an environmental liability

15   case, and I was basically an expert in that case.   11:02:52AM

16      Q    Okay.  Any other depositions that you can

17   recall?

18      A    No.

19      Q    Were you retained as an expert witness in

20   that case?                                          11:03:01AM

21      A    Yes.

22      Q    Let me go over the rules of deposition

23   really quickly.  The woman to your left and to my

24   right is taking down what I'm saying and what you

25   are saying.  Do you understand that?                11:03:13AM

7

| | | |
|---|---|---|
| 1 | A    Uh-huh.  Yes. | 11:03:14AM |
| 2 | Q    And she -- although we are on video, she | |
| 3 | is preparing the official transcript of this | |
| 4 | proceeding.  And because she is typing it's | |
| 5 | important to -- for me to allow you to finish and | 11:03:23AM |
| 6 | for you to allow me to finish before you answer.  Is | |
| 7 | that okay? | |
| 8 | A    Yes.  That's okay. | |
| 9 | Q    I'm going to understand -- I'm going to | |
| 10 | assume that you understand everything I ask unless | 11:03:31AM |
| 11 | you tell me differently.  Okay? | |
| 12 | A    Okay. | |
| 13 | Q    So if you don't understand a question I'm | |
| 14 | asking or need some further clarification, just let | |
| 15 | me know and I'll try to do that for you.  Okay? | 11:03:42AM |
| 16 | A    Okay. | |
| 17 | Q    Is there any reason you can't proceed with | |
| 18 | your deposition here today? | |
| 19 | A    No. | |
| 20 | Q    You are a practicing attorney; is that | 11:03:50AM |
| 21 | correct? | |
| 22 | A    I am a licensed attorney.  I currently | |
| 23 | really don't practice law per se.  I'm really sort | |
| 24 | of involved in the administrative side of a law | |
| 25 | firm. | 11:04:02AM |

RONALD MILLER

8

```
1       Q    Okay.  How long have you held your license      11:04:02AM
2   as an attorney?
3       A    Since 1987.
4       Q    And where did you get your law degree
5   from?                                                     11:04:11AM
6       A    University of Detroit.
7       Q    And what about undergrad?
8       A    Michigan State University.
9       Q    Did you go straight through from undergrad
10  to law school?                                            11:04:19AM
11      A    Yes.
12      Q    Have you always -- are you licensed in any
13  other states, or have you ever been licensed in any
14  other states other than California?
15      A    Yes, Michigan.                                   11:04:27AM
16      Q    Any others?
17      A    No.
18      Q    Are you still licensed in Michigan?
19      A    Yes.
20      Q    Do you have any history of any bar-related       11:04:37AM
21  discipline, suspensions, censures or anything else?
22      A    Yes.  In Michigan there's a -- there is
23  a -- what they call reprimand is what it was.
24      Q    Okay.  Can you tell me what that was for?
25      A    That was for failure to supervise               11:04:55AM
```

9

1      attorneys in accordance with the rules as stated in        11:05:00AM

2      Michigan.

3          Q      What year was that reprimand received?

4          A      I believe it was 2005, maybe 2004.

5          Q      Okay.  Any disciplinary history              11:05:22AM

6      suspensions, reprimands or any other in California?

7          A      No.

8          Q      Was the -- were the attorneys that you

9      were alleged to have failed to supervise, were those

10     attorneys employed by Disability Group?              11:05:33AM

11         A      No.

12         Q      Okay.  Was that -- let me just take it

13     step-by-step.  Was that reprimand related to

14     anything related to disability advocacy or --

15         A      No.                                         11:05:44AM

16         Q      -- social security disability benefits

17     advocacy?

18         A      No.

19         Q      What subject matters were those attorneys

20     handling?                                             11:05:54AM

21         A      Criminal defense.

22         Q      Have you ever practiced -- and I -- I'm

23     just basing this on your answer that you are not

24     currently practicing, you are more managing a

25     business.                                             11:06:12AM

10

| | | |
|---|---|---|
| 1 | A     Uh-huh. | 11:06:13AM |
| 2 | Q     Have you ever practiced in the field of | |
| 3 | Disability Rights Advocacy? | |
| 4 | A     No. | |
| 5 | Q     Have the disability -- the company | 11:06:21AM |
| 6 | Disability Group is a disability advocacy company; | |
| 7 | is that correct? | |
| 8 | A     That is correct. | |
| 9 | Q     How long have you been involved with the | |
| 10 | Disability Group? | 11:06:32AM |
| 11 | A     Since 2004. | |
| 12 | Q     Let's take this chronologically, and I'll | |
| 13 | do this as quickly as I can.  After leaving the | |
| 14 | University of Detroit did you begin practicing law? | |
| 15 | A     Yes. | 11:06:53AM |
| 16 | Q     Where did you practice? | |
| 17 | A     For the law firm of Dykema, D-y-k-e-m-a, | |
| 18 | in Detroit, Michigan. | |
| 19 | Q     How long did you practice there? | |
| 20 | A     It was just under a year. | 11:07:05AM |
| 21 | Q     And where did you go next? | |
| 22 | A     After that I started a company at that | |
| 23 | time called Toxicheck, T-o-x-i-c-h-e-c-k. | |
| 24 | Q     Okay.  And how long did you operate that | |
| 25 | company? | 11:07:25AM |

11

| | | |
|---|---|---|
| 1 | A    That company and the companies that it | 11:07:26AM |
| 2 | evolved to -- I was involved in that company until | |
| 3 | 1993. | |
| 4 | Q    Okay.  And when you say "involved," did | |
| 5 | that involve the companies that it evolved into as | 11:07:41AM |
| 6 | well? | |
| 7 | A    Yes, that's correct. | |
| 8 | Q    Okay.  And can you give me a quick | |
| 9 | description of the names of the companies that | |
| 10 | Toxicheck evolved into? | 11:07:51AM |
| 11 | A    Yes.  It became Environmental -- | |
| 12 | MR. KOHN:  Is the answer to the question | |
| 13 | yes? | |
| 14 | Can I have the question read back, please. | |
| 15 | (Record read as follows: | 11:08:11AM |
| 16 | "Q    Okay.  And can you give me a | |
| 17 | quick description of the names of the | |
| 18 | companies that Toxicheck evolved into?") | |
| 19 | MR. KOHN:  Is the answer yes?  Ron, is | |
| 20 | that your answer? | 11:08:17AM |
| 21 | THE WITNESS:  I'm not -- | |
| 22 | MR. KOHN:  Can you? | |
| 23 | THE WITNESS:  I'm not -- I'm not sure. | |
| 24 | MR. KOHN:  Can you? | |
| 25 | THE WITNESS:  Oh, yes, I can. | 11:08:25AM |

RONALD MILLER

```
                                                              12
1            MR. KOHN:   Thank you.                   11:08:27AM
2    BY MR. PARKER:
3         Q    Can you please describe --
4              THE WITNESS:   Sorry.
5    BY MR. PARKER:                                   11:08:28AM
6         Q    -- the companies --
7              MR. PARKER:   Counsel, please don't cut
8    your witness off.  If he's volunteering, you can
9    take a break.  You can talk to him, but don't cut
10   off the witness again.  Okay.  Please don't cut off   11:08:34AM
11   his answer.
12   BY MR. PARKER:
13        Q    Could you please describe for me the names
14   of the companies that Toxicheck evolved into?
15        A    It became Environment Information Systems,   11:08:46AM
16   Incorporated, and then later Vista Environmental
17   Information, Incorporated.
18        Q    Were you the owner of those companies?
19        A    Toxicheck -- I was a partner in Toxicheck.
20   I was a minority shareholder in Environmental       11:09:16AM
21   Information Systems and I was a minority shareholder
22   in Vista.
23        Q    Okay.  And then were you an -- also an
24   employee of Environmental Information Systems --
25        A    Yes.                                    11:09:26AM
```

13

1    Q    -- and employee of Vista Environmental?    11:09:26AM

2    A    Yes.

3    Q    So after '93 where did you go next?

4    A    I then started a criminal defense law firm

5    called Chase & Miller.  That's C-h-a-s-e ampersand    11:09:43AM

6    Miller.

7    Q    And was that in Michigan?

8    A    No.  That was here in Los Angeles.

9    Q    Okay.  When did you actually -- and I

10   apologize.  I think you mentioned this date.  When    11:10:01AM

11   did you become licensed to practice in California?

12   A    1994.  '93 or '94.  I don't remember.

13   Q    Okay.  And -- so you founded a criminal

14   defense law firm in California?

15   A    Yes.    11:10:18AM

16   Q    Where was that firm located?

17   A    That was located in Sherman Oaks,

18   California.

19   Q    Okay.  How long did you practice and was

20   that -- that was criminal defense firm, correct?    11:10:31AM

21   A    Yes.

22   Q    How long did you practice criminal defense

23   law from 1993 on?

24   A    From 1993 through 2003.

25   Q    Okay.  And then in 2003 what did you begin    11:10:45AM

14

1    doing?                                                    11:10:51AM

2         A    I then just began exploring other business

3    opportunities.

4         Q    Are you the sole owner of Disability

5    Group?                                                    11:11:06AM

6         A    Yes.

7         Q    When did you found Disability Group?

8         A    2004.

9         Q    And did you start it from scratch or was

10   it an asset acquisition or something else, or was it     11:11:22AM

11   just -- basically started from scratch?

12        A    Started from scratch.

13        Q    That was the world's worst question.  I

14   apologize.  Were there any other business

15   opportunities between 2003 and the founding of           11:11:33AM

16   Disability Group 2004 to which you developed --

17   devoted a substantial amount of your time or

18   resources?

19        A    No.

20        Q    Was there also a criminal defense practice     11:11:45AM

21   in the '04-'05 time period in Michigan in which you

22   were involved?

23        A    No.

24        Q    Okay.  So the reprimand came about from

25   some earlier alleged failure to supervise?               11:12:00AM

RONALD MILLER

Page 15

| | | |
|---|---|---|
| 1 | A    That is correct. | 11:12:03AM |
| 2 | Q    Okay.  Did Chase & Miller, in addition to | |
| 3 | practicing in California, did it also have a | |
| 4 | practice in Michigan? | |
| 5 | A    I don't believe so. | 11:12:11AM |
| 6 | Q    Okay.  I'm just trying to get a general | |
| 7 | idea of the scope of your business activities.  What | |
| 8 | business activities were you involved in in Michigan | |
| 9 | after 1993? | |
| 10 | A    None. | 11:12:31AM |
| 11 | Q    Okay.  So how did this -- | |
| 12 | A    Oh, I'm -- after 1993? | |
| 13 | Q    Yes, after 1993. | |
| 14 | A    Through the criminal defense firm is -- | |
| 15 | that -- that was operating in the state of Michigan | 11:12:43AM |
| 16 | subsequent to 1993. | |
| 17 | Q    Okay.  I understand.  How did the idea -- | |
| 18 | how did you get the idea to found and run Disability | |
| 19 | Group? | |
| 20 | A    I had explored other areas of law where I | 11:13:15AM |
| 21 | could use the business skills and business knowledge | |
| 22 | that I had learned through my experience at the | |
| 23 | criminal defense firm. | |
| 24 | Q    Let me back up for a second.  What was | |
| 25 | your undergraduate degree in at Michigan State? | 11:13:33AM |

RONALD MILLER

Page 16

```
 1        A    Business administration.                 11:13:36AM

 2        Q    And at all -- at the time -- from the time

 3    it was founded until today Disability Group has been

 4    a hundred percent owned by you --

 5        A    Yes.                                      11:13:51AM

 6        Q    -- is that correct?

 7             All right.  So you founded it in 2004 and

 8    you've run it since then; is that correct?

 9        A    That is correct.

10        Q    What is your title with Disability Group?  11:14:03AM

11        A    Managing director.

12        Q    Is it -- Disability Group is a

13    corporation; is that correct?

14        A    Yes.

15        Q    Do you hold any other titles?             11:14:18AM

16        A    No.

17        Q    Are there any other officers or directors

18    of Disability Group today?

19        A    No.

20        Q    Have there ever been any other officers or  11:14:34AM

21    directors of Disability Group other than you?

22        A    No.

23        Q    How many employees does Disability Group

24    currently employ?

25        A    51.                                       11:14:47AM
```

18

1    business as Disability Group.                          11:15:54AM

2        A    I'm not sure I understand the question.

3        Q    Yeah.  Let me lay some -- some ground work

4    for that.  You -- in the 2003-2004 time frame you

5    were looking at various potential businesses to         11:16:10AM

6    start; is that fair?

7        A    Yes.

8        Q    Okay.  So you were looking for a business

9    opportunity?

10       A    Yes.                                            11:16:21AM

11       Q    Okay.  What -- what was it about the area

12   of disability advocacy that led you to start

13   Disability Group?

14       A    The ability to generate cases through

15   advertising as opposed to a personal referral.          11:16:40AM

16       Q    Anything else?

17       A    The relative lack of competitiveness in

18   the advertising marketing space.

19       Q    Okay.  Anything else that comes to mind

20   today?                                                  11:17:03AM

21       A    That's -- that's it.

22       Q    How did you determine that there was a

23   lack of competitiveness in the advertising in that

24   disability advocacy market?

25       A    Looking -- just using sort of personal         11:17:25AM

RONALD MILLER

19

1    knowledge of where I hadn't, you know, seen much          11:17:28AM

2    advertising in the Yellow Pages primarily, on the

3    Internet and over TV and radio.

4         Q    And when you originally founded Disability

5    Group, were you looking just at the California            11:17:45AM

6    market or were you looking at the national market or

7    both?

8         A    National market.

9         Q    Did you put together any written business

10   plan or business strategy document before you            11:17:59AM

11   started the Disability Group?

12        A    There were financial plans, yes.

13        Q    Okay.  Did you take out -- did you show

14   those financial plans to any third parties like

15   banks or potential investors or even business            11:18:14AM

16   advisers?

17        A    No.

18        Q    Did you take out -- let me ask it a

19   different way.  How did you fund the startup of

20   Disability Group, out of personal funds?                 11:18:35AM

21        A    Personal funds.

22             MR. KOHN:  Objection; it's not relevant.

23   He's not going to answer it.

24   BY MR. PARKER:

25        Q    The -- in the financial documents that --      11:18:43AM

20

| | | |
|---|---|---|
| 1 | that you put together in connection with the | 11:18:53AM |
| 2 | decision to start the Disability Group, did you | |
| 3 | identify the competitive market in those documents | |
| 4 | in any way? | |
| 5 | A    No. . | 11:19:06AM |
| 6 | Q    Do you recall at the time whether -- and | |
| 7 | I'm talking about 2004 when you formed Disability | |
| 8 | Group -- whether you identified who the competitors | |
| 9 | in the market were either in writing or in your | |
| 10 | head? | 11:19:23AM |
| 11 | A    I do- -- I don't recall, but I'm -- I just | |
| 12 | don't recall. | |
| 13 | Q    Other than looking in the Yellow Pages and | |
| 14 | on the Internet, what additional research did you do | |
| 15 | to determine the extent of advertising for | 11:19:49AM |
| 16 | disability advocacy services? | |
| 17 | MR. KOHN:  Objection; assumes facts not in | |
| 18 | evidence. | |
| 19 | BY MR. PARKER: | |
| 20 | Q    You can answer the question. | 11:20:01AM |
| 21 | A    I believe that I had gotten the reports | |
| 22 | from -- I -- I believe they are produced by a | |
| 23 | company called Nielson which are ratings, or I guess | |
| 24 | it's a list of all the attorneys that are | |
| 25 | advertising in the Los Angeles market and seeing how | 11:20:21AM |

RONALD MILLER

21

| | | |
|---|---|---|
| 1 | much or little they spent. | 11:20:26AM |
| 2 | Q    Okay.  And is that -- can you spell | |
| 3 | Nielson for me, to the best of your recollection? | |
| 4 | A    Boy, I think it's N-i-e-l-s-o-n or e-n. | |
| 5 | To be honest with you that's just a guess.  I -- I | 11:20:41AM |
| 6 | don't know. | |
| 7 | Q    Did you purchase those reports -- | |
| 8 | A    No. | |
| 9 | Q    -- from Nielson? | |
| 10 | How did you get them? | 11:20:49AM |
| 11 | A    I believe they were given to me by an | |
| 12 | agency, an ad agency or a TV station, but I don't | |
| 13 | recall -- | |
| 14 | Q    Okay. | |
| 15 | A    -- which of the two. | 11:21:00AM |
| 16 | Q    Do you recall -- do you still have those | |
| 17 | reports -- | |
| 18 | A    No. | |
| 19 | Q    -- in your possession? | |
| 20 | Do you recall how they broke out the | 11:21:08AM |
| 21 | market segments in terms of analyzing advertising? | |
| 22 | For example, was it legal services or was it more | |
| 23 | specific than that? | |
| 24 | A    Yes.  I believe it was just legal | |
| 25 | services. | 11:21:22AM |

22

1      Q    Okay.  Do you recall what advertisers that      11:21:24AM

2    report listed at the time you looked at it?

3      A    I know there was more than one page, but I

4    don't remember exactly who was on it.

5      Q    Okay.  Other than the Nielson reports and      11:21:39AM

6    the other items that you looked at with respect to

7    advertising, do you recall anything else that you

8    looked at with respect to determining what the

9    extent of advertising was in the disability

10   advocac- -- advocacy segment?                          11:21:54AM

11     A    No.

12     Q    So you founded Disability Group in 2004?

13     A    Yes.

14     Q    And when you founded it, did you hire

15   anybody or was it just you?                            11:22:18AM

16     A    No.  I began hiring employees also in

17   2004.

18     Q    Okay.  I just want to get a general idea

19   of the -- of the growth path of the business.  Do

20   you recall how many employees Disability Group had    11:22:37AM

21   in '05?

22     A    No.

23     Q    Okay.  Do you have -- even have an

24   estimate?

25     A    20 would be -- but that's just a guess.         11:22:45AM

RONALD MILLER

25

1      A    Greg Yost.                                    11:25:35AM

2      Q    Okay.  Other than -- you looked at Nielson

3   documents that identified advertisers in the legal

4   services sphere; is that correct?

5      A    Yes.                                          11:25:52AM

6      Q    Okay.  Was -- and that was for the

7   Los Angeles area?

8      A    Yes.

9      Q    Any other geographical areas for which you

10  looked at any kind of Nielson reports?              11:26:01AM

11     A    No.

12     Q    Were you aware when you founded Disability

13  Group that Binder and Binder was operating the

14  disability advocacy segment?

15     A    Yes.                                          11:26:25AM

16     Q    How were you aware of that?

17     A    I think I -- I'm certain I had seen their

18  name on the Nielson reports, and other than that

19  I -- I don't recall.

20     Q    Do you recall if you've ever seen any of    11:26:45AM

21  their television ads?

22     A    I don't believe I have.

23     Q    What about their print advertisements,

24  have you ever seen their print advertisements?

25     A    No.                                          11:26:57AM

32

1    that Binder and Binder operated in the disability         11:35:47AM

2    advocacy sphere through the National Association of

3    Disability Representatives?

4        A    Yes.

5        Q    Is there some -- well, do you recall              11:35:59AM

6    specifically as to Binder and Binder how you became

7    aware of their affiliation or membership in the

8    National Association of Disability Representatives?

9        A    I'm sorry.  Can you ask the question

10   again?                                                     11:36:13AM

11       Q    Sure.

12            MR. PARKER:  Can you read that back.

13            (Record read as follows:

14            "Q    Is there some -- well, do you

15            recall specifically as to Binder and             11:36:44AM

16            Binder how you became aware of their

17            affiliation or membership in the National

18            Association of Disability

19            Representatives?")

20            THE WITNESS:  I -- I don't know whether           11:36:33AM

21   they are affiliated or have membership in that group

22   or not.

23   BY MR. PARKER:

24       Q    Okay.  Now, you testified that in

25   connection with your decision to go into the             11:36:55AM

33

1    disability advocacy segment -- I'm just calling it a    11:37:00AM

2    segment in a business sense -- you reviewed a

3    Nielson report that reflected television

4    advertisements; correct?

5        A    Yes.                                          11:37:12AM

6        Q    Okay.  Now, that report by your

7    recollection was divided -- the segment that it

8    described was legal services; is that correct?

9        A    Yes.

10       Q    Okay.  How did you figure out within that     11:37:23AM

11   segment of legal services which of the advertisers

12   listed in that Nielson report were operating in the

13   disability advocacy segment?

14       A    I actually went through and called the

15   ones -- some of them I -- I was familiar with like    11:37:40AM

16   Larry Parker, and others I called information, got

17   the phone number, dialed their office and asked if

18   they handled social security disability cases.

19       Q    Okay.  You went through the whole list?

20       A    Yeah.                                         11:37:56AM

21       Q    Other than people like Larry Parker --

22       A    That I knew.

23       Q    -- that you knew.

24       A    Right.

25       Q    Okay.  So do you recall whether or not you    11:37:59AM

35

1        Q    Prior to your involvement, or founding of    11:40:15AM

2    Disability Group, have you been involved in any

3    company that utilized Google ad words for purposes

4    of generating -- for purposes of advertising?

5        A    Yes.    11:40:16AM

6        Q    Which businesses?

7        A    That was the criminal defense law firm.

8        Q    Okay.  Chase & Miller?

9        A    Yes.

10        Q    And did you -- did Axsen do that for you    11:40:16AM

11    at Chase & Miller or was it some somebody else?

12        A    Somebody else.

13        Q    Okay.  Were you ever -- have you ever

14    personally been involved in actually operating the

15    Google ad word system or actually typing in the ad    11:40:19AM

16    words that are --

17        A    No.

18        Q    -- utilized?

19            No?

20        A    No.    11:40:30AM

21        Q    How did you come into contact with Axsen?

22        A    Through the Internet.

23        Q    Okay.  How was it that you came into

24    contact with them through the Internet?  Were you

25    doing a search or what?    11:40:52AM