


**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

***Harry J. Binder, et al.***
**Plaintiffs,**
**v.**
***Disability Group, Inc., et al.***
**Defendants.**

**CASE NO. CV 07-2760-GHK (Ssx)**

**MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. Background**

We held a court trial on the above-captioned matter from October 5, 2010 through October 7, 2010. We received evidence, heard testimony, observed the manner and demeanor of the witnesses, and considered the declarations and deposition testimony of various persons. On November 18, 2010, we heard closing arguments from the Parties. Having considered all of the foregoing as well as arguments from counsel, we make the following findings of fact and conclusions of law in this Memorandum under Federal Rule of Civil Procedure 52(a)(1).

At trial, Plaintiffs Harry J. Binder; Charles E. Binder; Binder & Binder - The National Social Security Disability Advocates LLC; Binder and Binder - The National Social Security Disability Advocates (NY), LLC; Binder & Binder - The National Social Security Disability Advocates (NJ), LLC; Binder & Binder - The National Social Security Disability Advocates (PA), LLC; Binder & Binder - The National Social Security Disability Advocates (NC), LLC; Binder & Binder - The National Social

Security Disability Advocates (FL), LLC; Binder & Binder - The National Social Security Disability Advocates (TX), LLC; Binder & Binder - The National Social Security Disability Advocates (IL), LLC; and Law Offices - Harry J. Binder and Charles E. Binder P.C. (collectively, "Plaintiffs") pursued three claims against Defendants Disability Group, Inc. and Ronald Miller ("Miller" and, collectively, "Defendants"). Plaintiffs' three claims are: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); (2) false representation under the Lanham Act, 15 U.S.C. § 1125(a); and (3) unfair competition under California common law.

Both Parties agree that from March 26, 2006 to November 6, 2006 Defendants used Plaintiffs' trademark in an advertising campaign through Google AdWords. Google AdWords allows advertisers to pay to place targeted "Sponsored Links" on the results page of a Google search. In order to have their ads appear on the search results page, Google advertisers select and bid on AdWords (purchased keywords) so that their ad might be displayed on the search results. Defendants used "Binder and Binder" as AdWords linked to their websites. Defendants raise a number of defenses to Plaintiffs' claims. We discuss each of these claims and defenses in turn below.

## II. Plaintiffs' Claims

### *A. Claim for Infringement of Registered Trademark*

Plaintiffs' first claim is that Defendants' use of the "Binder and Binder" mark constituted trademark infringement. To prevail on a trademark infringement claim, a plaintiff must prove by a preponderance of the evidence that it is a holder of a registered trademark, and a defendant used: (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any services; (5) where such use is likely to cause confusion, or to cause a mistake or to deceive. 15 U.S.C. § 1114(1)(a); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).

Here, there is no dispute that Plaintiffs did not give consent. The use of the AdWords through Google constituted use in commerce in connection with the sale or advertising of Defendants' services. *Playboy Enter., Inc. v. Netscape Commc'n Corp.*, 354 F.3d 1020, 1024 (9th Cir. 2004). The Defendants do not dispute that they used Plaintiffs' mark in their Google AdWord campaign. Moreover,

we find as a matter of fact that Defendants used the "Binder and Binder" mark in a Google AdWord campaign. We find that Defendants bid successfully on the name with the result that Defendants' website appeared as a sponsored link on Google when potential customers searched for Plaintiffs' trademarked name. Thus, the only two elements in dispute are Plaintiffs' ownership of the marks and the likelihood of confusion.

### *1. Ownership of the Marks*

Plaintiffs claim trademarks for: "Binder & Binder," Trademark Reg. No. 2,161,478; "Binder and Binder," Trademark Reg. No. 2,161,479; and Binder & Binder, in a stacked design, Trademark Reg. No. 2,109,191. (Exh. Nos. 330, 331, and 332). These three trademarks were initially registered in 1997 and 1998 to "Binder and Binder (Partnership)." (*Id.*) However, in 2004, the Partnership was registered as an LLP under New York law. In 2006, the trademarks were assigned by the LLP to "Binder & Binder." (Exh. No. 149). In 2009, a correction was filed which stated that the trademarks were intended to be assigned to "Binder and Binder." In 2010, the trademarks were assigned to SSDI Holdings, (Exh. No. 338), and subsequently assigned to "Binder & Binder – The National Social Security Disability Advocates LLC." (Exh. No. 339).

Defendants bring two challenges to Plaintiffs' ownership of these marks. First, Defendants claim there is a defect in the chain of title. Specifically, they argue that in 2006 the assignor did not own the marks it sought to assign to Binder & Binder. The premise of this argument is that Binder and Binder Partnership, the owner of the registered marks, is a separate legal entity from Binder and Binder LLP, which acted as the assignor in 2006. This presents a question of law inasmuch as the Parties do not dispute the underlying facts. We reject Defendants' premise that Binder and Binder Partnership became a separate legal entity when it was registered as a LLP under New York law in 2004.[1] Under New York Partnership Law § 121-1500(d), an LLP is "for all purposes the same entity that existed before the registration and continues to be a partnership without limited partners under the laws of this state." As one court explained: "The statute clearly enunciates that a general partnership that is registered as a

---

[1] Although it is true that Mr. Binder testified that there was a merger, Mr. Binder's incorrect opinion about the law does not control.

RLLP is for all purposes the same entity that existed before registration and continues to be a general partnership under the laws of New York." *Mudge Rose Guthrie Alexander & Ferdon v. Pickett*, 11 F. Supp. 2d 449, 452 n.12 (S.D.N.Y. 1998). Thus, we conclude there was no defect in the chain of title to the marks.

Defendants' next argument is that the 2006 assignment to "Binder & Binder" rather than "Binder and Binder" rendered the assignment ineffective. Again, this is a question of law as both Parties agree that the assignment was made to "Binder & Binder" while the name of the partnership at the time was written as "Binder and Binder." The question is whether this error has any effect on the ownership of the trademarks. We disagree with Defendants that this recordation has any impact on the claims at issue in this case. *See* TMEP § 503.06(a)(i), U.S. Patent and Trademark Office (6th ed., Rev. 1 Oct. 2009) ("If the original cover sheet contains a typographical error that does not affect title to the application or registration against which the original assignment or name change is recorded, the Assignment Services Branch will correct the Assignment Database and permit the recording party to keep the original date of recordation."). The initial error is not a material defect that impacts title. Defendants still had notice upon viewing the trademark that it was a properly recorded trademark. Although more precision may be desirable when the question is what is the trademark itself, we do not confront that question here. The use of the ampersand rather than the word "and" relates only to describing the entity that owns the trademarks not the precise nature of the trademarks themselves. Thus, we reject both of Defendants' challenges to Plaintiffs' ownership of the marks and conclude that Plaintiffs had valid ownership of the trademarks.

***2. Likelihood of Confusion***

In evaluating the likelihood of confusion, we consider eight non-exhaustive factors (the "*Sleekcraft* factors") whose relative importance varies from case to case: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets;[2] and (8) the degree of care likely to be exercised

---

[2]There was no evidence presented as to this factor.

by purchasers of the defendant's product.[3] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Moreover, "[i]n the context of the Web in particular, the three most important *Sleekcraft* factors [the 'Internet trilogy'] are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).

Here, we find there was a strong likelihood of confusion. Plaintiffs' mark[4] and that used by Defendants are identical – both are Plaintiffs' registered trademark of "Binder and Binder." We find that Plaintiffs' marks are strong based on testimony that Plaintiffs extensively marketed and advertised their services and worked to build their reputation based around their name. (Dick Summer Trial Testimony, Day 1 court trial, 150). The services provided are identical – both Plaintiffs and Defendants are competing for clients for social security disability cases. Defendants intentionally chose Plaintiffs' mark based on its strength and appeal in the market. Additionally, both Plaintiffs and Defendants market their products through the Internet and rely upon it to obtain clients.

We also find that potential clients suffered actual confusion regarding the mark. Although the survey conducted by Jessica Bowers may not have been ideal,[5] we find that it is one piece of evidence among others, including witness testimony, that establishes actual confusion. (Exh. No. 308). Sixteen

---

[3]Plaintiffs briefly mention that "[t]he consumers are not sophisticated purchasers." (Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law, ¶ 97). Plaintiffs offered no specific evidence to support this at trial. Such an inference, however, is supported by the nature of these cases and the type of online searches that were conducted. Nonetheless, given that the other factors are sufficient to support a finding that Defendants' actions were likely to cause confusion, we need not rely on this factor.

[4]Although the evidence shows that Defendants actually used only the "Binder and Binder" mark, that use is also confusingly similar to Plaintiffs' other two registered marks so that Defendants' acts constitute infringement of all three marks.

[5]We also find that Defendants' behavior contributed to the low answer rate in the survey. For example, we credit Karen Funk Sellers's testimony that a representative of Disability Group called on the telephone and told her to ignore the survey. (Deposition of Karen Funk Sellers, 11 ("[Disability Group] called me on the phone and told me to ignore this letter.")). In light of Defendants' attempt to subvert the survey, their complaints about the purportedly low answer rate are unconvincing. Defendants should not benefit from their attempt to undermine the survey. Moreover, to the extent Defendants object to this testimony on hearsay grounds, that objection is overruled. *See* Fed. R. Evid. 801(d)(2)(D).

of the seventeen individuals polled under the survey believed that when they clicked on Defendants' website following their search, they were actually being brought to Binder and Binder's website. Fifteen out of seventeen thought that when filling out submission forms on Defendants' site, they were doing so on Binder and Binder's website or someone associated with them.

The deposition testimony of several individuals also establishes that there was actual confusion. (*See, e.g.*, Deposition of Lynn Bouileau, 8 (testifying that she believed she was on the Binder and Binder home page); Deposition of Karen Funk Sellers, 11-12 (testifying she believed she had retained Binder and Binder or someone associated with them); Deposition of Mamon Trotter, Jr., 9 (testifying that he believed he was submitting a form to Binder and Binder or someone associated with them); Deposition of Mary Ann Addington, 14 (testifying that she would not have hired Disability Group if she had known that they had nothing to do with Binder and Binder)). We also note that this deception continued even during real-time discussions with Defendants. For example, Mario Davila made a test call and spoke to Defendants' employee who, unaware that Davila was a Binder and Binder employee, misrepresented Defendants' relationship with Plaintiffs. Defendants claimed that they advertised for Binder and Binder, and Binder and Binder sent them cases. (Mario Davilo Trial Testimony, Day 2 court trial, 164-65).

In any event, even without this evidence of actual confusion, we find there is more than enough evidence to establish the likelihood of confusion. Having considered the evidence in the record as well as all the *Sleekcraft* factors, particularly the Internet trilogy, we find there was a strong likelihood of confusion.

Thus, we conclude that Plaintiffs have proven by a preponderance of the evidence that Defendants infringed Plaintiffs' registered trademarks as alleged in the first claim.

***B. False Advertising Claim***

Plaintiffs also brought suit under 15 U.S.C. § 1125(a) for false advertising. This section states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Based on the above findings and conclusions, we conclude that Plaintiffs have proven by a preponderance of the evidence that Defendants used Plaintiffs' mark in their advertising campaign through Google to market their business in a manner that was likely to confuse potential clients and that deceived potential clients into thinking they were being led to Plaintiffs' website. Thus, we conclude that Defendants are liable for the second claim under 15 U.S.C. § 1125(a).

***C. State Law Claim for Unfair Competition***

Plaintiffs also brought suit under California common law for unfair competition. "The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992). Damages are available under state common law for unfair competition. *Id.* "The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection." *Fisher Inv., Inc. v. Casper*, No. G039965, 2009 WL 27338, at *10 (Cal. App. Jan. 6, 2009) (quoting *Bank of the West*, 2 Cal. 4th at 1263). "According to some authorities, the tort also includes acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market." *Indust. Indem. Co. v. Apple Comp., Inc.*, 83 Cal. Rptr. 2d 866, 873 (Cal. App. 1999). "The policy term 'unfair competition' clearly includes both 'passing off' and the narrower tort of 'trademark infringement.'" *Id.* Damages are available under the common law tort of unfair competition. *See City Solutions, Inc. v. Clear Channel*

*Commc'n*, 365 F.3d 835, 842 (9th Cir. 2004).

Based on the above findings and conclusions, we conclude that Plaintiffs have proven by a preponderance of the evidence that Defendants used Plaintiffs' marks in their online campaign and in doing so attempted to pass off their website as Plaintiffs', and/or infringed on Plaintiffs' trademarks. Thus, we conclude that Defendants are liable for unfair competition under California common law.

**III. Damages**

***A. Lost Profits***

We conclude that Plaintiffs' are entitled to an award for lost profits. Plaintiffs earned an average revenue of $3,576.93 per case in California from December 1, 2005 through November 30, 2006.[6] (Exh.

---

[6] At closing argument, we questioned Plaintiffs' counsel regarding the sample size as well as the apparent difference between the cases retained in those years as opposed to revenue actually received in that year from cases retained in prior years. Nevertheless, we are convinced that given the overall experience, the nature of Plaintiffs' practice which receives payment only upon successful conclusion of a case that necessarily occurs in a year subsequent to the year of retention, and given that an individual calculation of the very large number of cases over an extended period of years would be impracticable, a gross revenue of $3,576.93 per case is a reasonable calculation notwithstanding our questions, and we so find as a matter of fact. Defendants have not presented any evidence based on an actual individual case analysis to undermine this calculation. (*See* Declaration of Donna Jackson, 3 ("I prepare these reports based upon the data entered daily of the fees earned by Binder and Binder from the Government. These reports are prepared from the data of fees received, which is input [sic] at or near the time the fees are received by an employee with knowledge of the fees. These records are kept in the course of a regulated conducted business activity, and it is the regular practice of Binder and Binder to make these report.")).

To the extent there is not mathematical precision, Defendants bear the risk of such imprecision. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1443 (9th Cir. 1990) ("It is well-established under California law that while the fact of damages must be clearly shown, the amount need not be proved with the same degree of certainty, so long as the court makes a reasonable approximation."). We also note that this amount, $3,576.93 average per case fee at the three California offices (Hayward, Los Angeles, and Santa Ana), is somewhat less than

No. 228). Plaintiffs retained 18.78%[7] of cases for which submission forms were entered on their site. Given that there were 188 submission forms entered on Defendants' site www.disabilitygroup.com (by individuals who had searched for Binder and Binder), a 18.78% retention rate would have translated into 35 additional cases. Thirty-five cases with a revenue of $3,576.93 would have translated into $125,192.55 in additional revenue for Plaintiffs. We reject Defendants' actual retention rate as not reflective of the cases Plaintiffs would have been able to secure had these submissions gone to Plaintiffs.

Based on Plaintiffs' expert, David S. Hanson, CPA, we find that Plaintiffs would have experienced a 5% incremental cost with the added cases. We find that Mr. Hanson's testimony, based on an accounting of Plaintiffs' costs for 2004, 2005, and 2006, is credible regarding the incremental cost Plaintiffs would have spent with the additional cases. (*See* Exh. No. 402). Given the size of Plaintiffs' practice, (over 13,687 cases from December 1, 2005 to November 30, 2006), these 35 cases were within Plaintiffs' ability to absorb with only such incremental costs. (*See* Exh. No. 138). Plaintiffs' business model is one in which many of the expenses are fixed and a large number of cases may be handled without escalating costs. Although there undoubtedly is a point at which the number of cases would have escalated costs beyond 5%, (for example at a certain point Plaintiffs would have needed to hire additional attorneys to handle the cases), that point was not reached here. Subtracting the 5% incremental costs from the $125,192.55 additional revenue, we find Plaintiffs would have earned an additional $118,932.92 in profits if not for Defendants' infringement. We find this methodology

---

Binder and Binder's average per case fee nationwide during the same period of time, which was $3,606.69. (Exh. No. 138).

[7]During closing argument, we also addressed the 18.78% retention rate on the binderandbinder.com site. Defendants' counsel had argued during trial that a lower retention rate, such as the 4.28% retention rate on Google, was more appropriate. (Exh. No. 141). However, the 18.78% rate is the more appropriate because the consumers who were confused in this case were looking specifically for Binder and Binder. (*See e.g.*, Deposition of Stacey Heinzman, 8 (describing that she searched specifically for Binder and Binder after seeing their ad on television); Deposition of Lynda L. Boileau, 7 (same); Deposition of Mamon Trotter, Jr., 8 (same)). Defendants have provided no evidence of why the other alternative retention rates, such as the general Google retention rate, would be more accurate than the retention rate on the specific Binder and Binder site. Thus, we find that the 18.78% rate from Binder and Binder's website is more appropriate given that is where the consumers would have ended up if not for Defendants' infringements – it is the site these consumers were specifically looking for.

sufficiently reliable and credible given all the circumstances disclosed on this record.

Defendants also diverted cases through a second website, www.socialsecuritydisability-helpcenter.com ("Helpcenter site"). There were 622 clicks to this site. There is not specific documentation regarding how many of the clicks resulted in submission forms on this site. Given the similarity of the two sites, we use the click-to-submission ratio from the www.disabilitygroup.com site ("Disabilitygroup site") to estimate the number of submissions that would have been obtained on this second site. The click-to-submission ratio on the Disabilitygroup site (based on 2,952 clicks which turned into 188 submissions) is 6.37%. Based on this rate, there would have been 40 submissions made on the Helpcenter site. Taking the 18.78% retention rate described above, these 40 submissions translate into roughly 8 retained cases. At the average revenue of $3,576.93 per case, these 8 cases would have resulted in $28,615.44 in additional revenue. Subtracting the same 5% incremental costs from these cases, we find Plaintiffs suffered an additional lost profit of $27,184.68.

We find that Plaintiffs lost a total profit of $146,117.60 from Defendants' infringement on the two sites ($118,932.92 for the Disabilitygroup site and $27,184.68 for the Helpcenter site).[8]

***B. Corrective advertising***

Plaintiffs also request an award for corrective advertising. "An award of the cost of corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole. It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995). Prospective corrective advertising costs may also be recovered. *Id.* In some instances, courts have authorized an award of corrective advertising in the amount of 25% of a defendant's advertising budget. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977).

---

[8]Defendants also challenge the expert's report because it relies, in part, on hearsay. Although the expert testimony and report were based in part on hearsay, experts are allowed to rely on hearsay. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001) ("experts are entitled to rely on hearsay in forming their opinions"). We find and conclude that the hearsay relied on by Plaintiffs' expert is of the type reasonably relied upon by experts in Mr. Hanson's field.

Plaintiffs have presented no evidence of any expenditures actually made to restore the value of their marks. Instead, they request a prospective corrective advertising award of $99,000, which is 25% percent of Defendants' advertising budget. We are concerned with the lack of any reasonably accurate measure with which to assess an appropriate award of corrective advertising. Although precision is not required, we think an award specifically for corrective advertising in this case would go beyond imprecision. The only known individuals who had negative opinions of Plaintiffs as a result of Defendants' acts have all had their opinion of Plaintiffs restored, and there is no indication they harbor any lasting ill-will. Plaintiffs argue that there are others whose mistaken ill-thoughts go uncorrected. Although that is indeed likely, there is no reasonable way to ascertain their existence and to target or include them in a corrective advertising campaign. Further, due to the limited period of infringement and the passage of substantial time, it is unlikely that any such residual misimpressions would, or now could, be remedied. Thus, while we agree with Plaintiffs' argument that there was a greater harm – specifically, to their reputation and the value of their marks – than the mere loss of the cases and profits described above, we decline to award a specific amount for corrective advertising. Any award based on an arbitrary percentage of Defendants' advertising budget is not sufficiently tethered to correcting the nature of the harm suffered in this case.

***C. Enhancements, Willfulness, and Miller's Liability***

Plaintiffs seek discretionary treble damages under 15 U.S.C. § 1117(a), based on Defendants' willful misconduct. The Lanham Act states that "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

Here, we find that Defendants' conduct was willful — Miller personally knew that the registered trademarks were being used. In fact, he directed and caused it to be done. Given that the question of Miller's involvement and willfulness are intertwined, we discuss them together below.

First, we find credible the evidence in the record that Miller discussed the Google AdWord campaign with David Dimas. Miller had hired Dimas to assess the cost effectiveness of Disability Group's keywords. Dimas prepared a report entitled "Top Scoring Words" which indicated that "binder" was Binder and Binder's top keyword. (Exh. No. 59). The handwritten notes from Dimas and Miller's meeting show that the two discussed this report. (Exh. No. 62). During Miller's testimony, he recalled reviewing some of the reports Dimas had prepared but could not recall the specifics of what he reviewed. We find this testimony – to the extent Miller disavows seeing this report and having knowledge about the strength of Binder's marks as shown in the report – not credible.

Second, following this discussion, Miller discussed the use of Binder and Binder in his ad campaign with Michael Scott Vincent, Defendants' other webmaster. In his declaration, Vincent stated: "In the course of managing Disability Group, Inc Keyword bidding campaign, I submitted thousands of Keywords and Keyword combinations. In some cases I created these on my own and in others I received suggestions from Ron Miller. Among many Keyword suggested, Ron Miller included the words 'binder and binder.'" (Exh. No. 7, p. 2 - Declaration of Michael Vincent). During his deposition testimony, Vincent also testified that there was no possibility that the use of the keyword "binder" was not directed by someone at Disability Group. Although Vincent somewhat hedged in his trial testimony, he ultimately acknowledged that this declaration was accurate. We credit Vincent's declaration and deposition testimony, and reject his trial testimony to the extent he denied recollection of this conversation. His declaration and deposition testimony were both more specific and closer in time to the occurrence of these events.

Finally, we find Harry Binder's testimony credible as to what Miller said during their phone conversation following discovery of Defendants' use of the mark. Harry Binder testified that he called Miller and asked Miller why Binder and Binder was being used by Disability Group. During his trial testimony, Harry Binder recalled the conversation as:

Q: And what did you say to Mr. Miller?

A: I asked him if he knew that he was using my name on the Website?

Q: What did he say?

A: He said, "yes." I asked him "why?" He said because they had done studies of the volume of calls for social security disability, and ours was the largest.

(Harry Binder Trial Testimony, Day 1 court trial, 84:12-20). Although Miller claimed that he could not recall this conversation, we find Harry Binder is credible in his account of this conversation. We find Miller is not credible when he claimed a failure of recollection. Given the undisputed harsh tone of the conversation, we find that Miller would certainly have recalled these statements. It is also telling that Miller did not specifically deny having made the foregoing admission. Overall, we disbelieve Miller's purported loss of recollection, and find that he made the above-quoted admissions.

We conclude that this evidence is more than sufficient to establish Miller's personal liability based on his direction of the infringement. "A corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation. This is true in trademark infringement and unfair trade practices cases." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (9th Cir. 1987); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (an "[o]fficer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf" (quoting *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979))). The evidence discussed above amply demonstrates that Miller directed and authorized the infringements.

Moreover, this evidence also proves that Defendants' actions were willful. "Willful infringement carries a connotation of deliberate intent to deceive." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993). "Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Adobe Systems Inc. v. Kern*, No. C 09-1076 CW (JL), 2009 WL 5218005, at *8 (N.D. Cal. Nov. 24, 2009) (quoting *Lindy Pen Co.*, 982 F.2d at 1406). Plaintiffs have established willfulness in this case. As described above, Defendants chose Plaintiffs' marks based on the market. In doing so, Defendants intentionally misled potential clients and directed business away from Plaintiffs and to their own websites. Defendants had the deliberate intent to direct clients to their sites with the false impression that they were Binder and Binder. Defendants also

intentionally chose Plaintiffs' marks with knowledge that they were registered trademarks and in an attempt to profit from them. For example, one of the reports prepared by Dimas, which we find he and Miller reviewed together, specifically had a ® affixed to Binder and Binder. (Exh. No. 56).

Under 15 U.S.C. § 1117(a), when a defendant acts willfully in its infringement, the Court may award up to treble damages to the plaintiff if it finds that lost profits are inadequate. *See Project Strategies v. Nat'l Commc'm Corp.*, 948 F. Supp. 218 (E.D.N.Y. 1996); *Taco Cabana Int'l Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) ("An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive."). Here, as described above, we conclude that there is a potential harm from lingering misimpressions that is unlikely to be fully captured by the lost profits. *Two Cabana Int'l.*, 932 F.2d at 1127 ("[E]nhancement could, consistent with the 'principles of equity' promoted in section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct."); *see also Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) ("So long as its purpose is to compensate a plaintiff for its actual injuries-even though the award is designed to deter wrongful conduct-the Lanham Act remains remedial."); *Otis Clap & Sons, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) ("[T]he monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty."). We have also found that Defendants acted willfully. Based on these findings and our consideration of all factors relevant to the question of enhancement, we exercise our discretion to award enhanced damages in the amount of double the Plaintiffs' lost profits. Such an award is consistent with the compensatory goals of the Lanham Act but is not so great as to be punitive. *See also Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) ("[Section] 35 of the Lanham Act does not authorize an additional award of punitive damages for willful infringement of a registered trademark. So long as its purpose is to compensate a plaintiff for its actual injuries-even though the award is designed to deter wrongful conduct-the Lanham Act remains remedial."). Thus, we enhance the damages award to $292,235.20.

***D. Exceptional Case***

An award of reasonable attorneys' fees and costs may be made in "exceptional cases" of trademark infringement. *See* 15 U.S.C. § 1117(a). "While the term 'exceptional' is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002).

Based on our above findings and conclusions, we find that Defendants were willful in their use of Plaintiffs' mark. Accordingly, this case is "exceptional." The use of the mark was a deliberate choice with the motive to confuse the market and divert potential Binder and Binder clients towards the Disability Group's websites. *See Earthquake Sound Corp. v. Bumper Indust.*, 352 F.3d 1210, 1218 (9th Cir. 2003) (stating a case is exceptional "where the infringement is willful, deliberate, knowing or malicious"). Plaintiffs are entitled to seek an award of reasonable attorneys' fees and costs.

***E. Punitive damages***

Plaintiffs request an award of punitive damages. Punitive damages are not available under the Lanham Act. *See* McCarthy on Trademarks and Unfair Competition, 30:97 ("[C]ourts have held that punitive damages are not recoverable in cases brought under the federal Lanham Act."). However, punitive damages are available under the common law claim for unfair competition. *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996). In assessing the appropriateness of punitive damages, we look to whether a defendant's actions were done with malice, oppression, or fraud. Cal. Civ. Code § 3294. Here, we are not convinced that Plaintiffs have shown malice, oppression, or fraud with clear and convincing evidence. *Waits v. Frito Lay Inc.*, 978 F.2d 1093 (9th Cir. 1992).

Moreover, Plaintiffs are not entitled to punitive damages as a matter of right even if these predicates are established. *Egan v. Mutual of Omaha, Ins. Co.*, 24 Cal. 3d 809, 821 (1979). The ultimate award rests in our discretion. *Id.* We believe that the double damages award is sufficient and reasonable to account for Plaintiffs' losses and Defendants' conduct. Thus, even if the predicates for punitive damages were established, we would exercise our discretion to decline to award punitive damages.

**IV. Defendants' Defenses**

***A. Limitations under 15 U.S.C. § 1111***

Defendants invoke 15 U.S.C. § 1111 which states that a registrant of a mark shall not recover if it does not give notice of the registration. The statute provides that notice may be provided "by displaying with the mark the words 'Registered in U.S. Patent and Trademark Office' or 'Reg. U.S. Pat. & Tm. Off.' or the letter R enclosed within a circle, thus ®." However, § 1111 also specifically provides that a defendant cannot assert the plaintiff's failure to use the ® if "the defendant had actual notice of the registration." As described above, we find that the Defendants had actual notice of the registration. Specifically, Miller saw the reports provided to him by Dimas in which Plaintiffs' logo specifically appeared with the ®. (Exh. No. 56) ("Binder & Binder ® America's Most Successful Disability Advocates"). As such, Defendants' argument based on the failure to use a ® is specifically foreclosed by the language of the statute because Miller had actual notice of the registration.

***B. Failure to Mitigate***

Defendants argue that Plaintiffs failed to take reasonable steps to mitigate their damages and that damages should be limited accordingly. *Thirfty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568 (1996) ("A plaintiff has a duty to mitigate damages and cannot recover losses [he] could have avoided through reasonable efforts."). Defendants bear the burden of establishing that Plaintiffs failed to mitigate. *Fontaine v. National R.R. Passenger Corp.*, 54 Cal. App. 4th 1519, 1531 (1997) ("defendant bears the burden of proof of establishing the plaintiff has failed to mitigate damages"); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978) (stating that the defendant bears the burden of proving the failure to mitigate damages).

Defendants argue that the flaws in the chain of title of the trademarks constitute a failure to mitigate damages because they failed to properly protect the marks. As described above, we reject Defendants' contentions of defect in title.

Defendants also argue that the failure to include the ® with their marks with the Google AdWords program was a failure to mitigate. Defendants assert that had Plaintiffs included the ® in conjunction with their mark on Google, Google would have automatically prevented Defendants' use of

Plaintiffs' mark. To the extent Defendants argue that they were unaware of the registration of Plaintiffs' marks and this notification from Google would have given them notice, we reject this argument because we have found that Defendants were in fact on prior actual notice of the registration of Plaintiffs' mark.

To the extent Defendants argue that despite their willful attempt to profit from Plaintiffs' mark, their attempt would have been unsuccessful due to the purported intervention of the third-party Google, we reject this argument as insufficiently supported by credible evidence. As a matter of fact, we do not credit the testimony of Defendants' witness about the purported blocking action by third-parties who were not present to testify and be subject to cross-examination. Defendants' argument is dependant upon Dimas's testimony regarding how registration works with Google and the purported blocking action that Google takes after a company registers. Dimas based his testimony on his experience with testing out other terms such as "Vioxx" and "Bextra" and that Google would not allow him to use those words as AdWords. (David Dimas, Day 3 court trial, 74:4-24). His testimony, however, only goes to the result – that certain words were blocked. He did not testify as to why Google blocked those words, and the procedures, if any, a trademark holder can undertake *ab initio* to obtain such a block. For example, his testimony is unclear whether a company can preemptively register their marks on Google or whether it is only something that can be done in response to specific complaints about infringements. If it is the latter, then Plaintiffs' failure to preemptively register does not constitute a failure to mitigate at all. Moreover, Dimas's testimony is unsupported by other evidence in the record. Yiu Hang Mui, who wrote Plaintiffs' advertising content on Google, was also asked about the Google purported blocking action during his deposition. Mui's testimony was speculative – he indicated that it was possible to obtain a blocking action through Google but that he did not know the process for obtaining one. (Deposition of Yiu Hang Mui, 23). The exhibit presented by Defendants about the "Ad Content" on Google does not provide any further details about how one can preemptively block others from using their registered marks. (Exh. No. 182). Without sufficient evidence about how and under what circumstances a preemptive block may be obtained, Defendants have not met their burden of showing that Plaintiffs did not take the necessary reasonable steps to mitigate their damages. Accordingly, we conclude that Plaintiffs have not failed to mitigate.

**V. Conclusion**

Based on the foregoing findings and conclusions, we conclude that Defendants are liable on all three of Plaintiffs' claims. We find that Defendants' infringement was willful. We further award Plaintiffs enhanced damages in the amount of double the lost profits for a total of $292,235.20. We also conclude that Defendant Ronald Miller is personally liable for willfully directing the infringement. Because this is an exceptional case, Plaintiffs are entitled to an award of reasonable attorneys' fees and costs. Given the circumstances of this case, we decline to award either punitive damages or any amount for corrective advertisement. Plaintiffs are thus entitled to a total of $292,235.20. Judgment shall issue accordingly.

**IT IS SO ORDERED.**

DATED: January 25, 2011

GEORGE H. KING
United States District Judge